UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **MONIQUE REMILLARD,** | CIVIL CASE NO.: 1:20-v-1141 |
| Plaintiff, | |
| v. | |
| **SOUTHERN NEW HAMPSHIRE HEALTH SYSTEM, INC. and FOUNDATION MEDICAL PARTNERS, INC.** | |
| Defendants. | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Monique Remillard ("Remillard" or "Plaintiff") by and through her attorney, KBV Law, alleges as follows:

**NATURE OF ACTION**

1. This action is brought to remedy discrimination on the basis of disability in the terms, conditions, and privileges of employment, including the right to be reasonably accommodated, protected by the Americans with Disabilities Act and the New Hampshire Law Against Discrimination.

**JURISDICTION**

2. This Court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 (federal question) and 1334 (civil rights).

3. Venue in this Court is appropriate pursuant to 42 U.S.C. § 12117(a), 42 U.S.C. §2000E-5(f)(3), and 28 U.S.C. §1391, because the employment practices involved in this dispute

1

occurred in Nashua, New Hampshire, and thus venue is proper in the District of New Hampshire.

## ADMINISTRATIVE PROCEEDINGS

4.Plaintiff has timely and fully complied with prerequisites for administrative exhaustion required for jurisdiction in this Court under the Americans with Disabilities Act ("ADA") and New Hampshire R.S.A. 354-A, the Law Against Discrimination ("NH LAD"), and thus all conditions precedent to this lawsuit within the meaning of Rule 9(c) of the Fed. R. Civ. Pro. has been performed or have otherwise occurred.

5.Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission on April 29, 2020 and within 300 days of the continuing action complained of. Plaintiff received her right to sue notice from the Equal Employment Opportunity Commission dated August 24, 2020. This lawsuit is timely filed within 90 days of receipt of that notice.

## PARTIES

6.Plaintiff Monique Remillard is an adult citizen residing at 12 Adelaide Avenue, Nashua, New Hampshire 03064.

7.The Defendant Southern New Hampshire Health System, Inc. ("SNHHS"), is a company which does business in Nashua, New Hampshire, and having a mailing address of PO Box 2014, 8 Prospect Street, Nashua, NH 03060.

8.The Defendant Foundation Medical Partners, Inc. (the "Foundation" and together with SNHHS, "Defendants") is a Company which does business in Nashua, NH, and having a mailing address of PO Box 2014, 8 Prospect Street, Nashua, NH 03060.

9.At all relevant times Plaintiff was a "qualified employee" as defined by 42 U.S.C. §12111(8) of the ADA. This is because she had been performing all the essential

functions of her job for more than two years prior to her unlawful termination and with reasonable accommodations would have been able to continue doing so.

10. Foundation is an extensive multi-specialty provider group that operates under the SNHHS umbrella of medical care services, including an oncology and hematology provider group in Nashua, NH where Plaintiff was employed.

11. SNHHS is affiliated with Massachusetts General Hospital. Massachusetts General Hospital is a founding member of Partners Healthcare, a multi-state health care system that includes many of the major medical providers in Massachusetts and Southern New Hampshire.

12. Defendants were each a "covered" employer as defined in 42 U.S.C. § 12111(5)(A) of the ADA at all relevant times. This is because each Defendant operates in the healthcare field, which affected commerce, and had over 100 employees working for it at all times from 2018 to the present.

## STATEMENT OF CLAIMS

**Plaintiff's Hiring and Disclosure of Her Disability.**

13. Plaintiff was employed by Defendants as a Registered Nurse ("RN") at Foundation Hematology/Oncology from on or about August 22, 2017, until on or about November 1, 2019.

14. On or about August 16, 2017, Plaintiff, an RN with experience working in hematology and oncology, was offered employment at Foundation Hematology/Oncology. The offer was contingent on a "post-offer pre-employment health assessment" and was subject to a probationary period for the first 90 days.

15. Plaintiff's job duties included, but were not limited to, providing nursing care to

3

patients by working with other providers and following nursing best-practice standards to identify patient needs and implement an appropriate plan of care.

16. Prior to her employment with Defendants, Plaintiff had been diagnosed with a severe sensitivity or allergy to certain chemical odors when inhaled, including chlorhexidine (a disinfectant), bleach and perfumes.

17. Plaintiff's condition is a disability as defined by the Americans with Disabilities Amendments Act of 2008, because when triggered it has substantially limited her ability to breathe and speak, among other major life activities and has, in cases of extreme exposure, required emergency medical intervention.

18. The Americans with Disabilities Amendments Act of 2008 applies to this claim of wrongful termination because the termination took place in 2019. Under the Americans with Disabilities Act ("ADA") as amended in 2008, a disability must be assessed in its active state, not in remission, and without regard to mitigating measures like Plaintiff's medical treatments.

19. On or about August 22, 2017, Plaintiff met with SNHHS' Employee Health and Wellness Services to complete the required pre-employment health assessment.

20. At the health assessment, Plaintiff disclosed her known allergy/sensitivity to bleach, chlorhexidine, and perfume/cologne to Defendants in the Pre-Employment Medical History she was required to complete.

21. Plaintiff also disclosed that she had experienced "allergic reactions that interfere with [her] breathing".

22. Plaintiff's Pre-Employment Physical Exam also reflects accommodations utilized at her previous place of employment for this medical condition.

4

**Defendant's Failure to Fully Engage in the Interactive Process
and Provide Reasonable Accommodations.**

23.     At or around the time of her hiring, Plaintiff had an extensive discussion with SNHHS's Employee Health and Wellness department regarding her allergic reaction to certain strong chemical odors.

24.     In or about January 2018, Plaintiff met with Employee Health and Wellness and identified issues in the workplace that were dangerous to her because of her medical condition, including the aerosolized air-freshener used in the bathroom, the scented decorations in the lab, the use of bleach as a cleaning product when she is working and the failure to implement a fragrance-free policy.

25.     Plaintiff requested that Defendants provide alternative non-aerosolized air-fresheners for the bathroom, restrict scented decorations, not permit bleach-containing products to be used during her shifts and implement a fragrance-free policy, but Defendants only partially complied with her requests for accommodation.

26.     Defendants refused to implement a fragrance-free policy or post signs notifying people that fragrances were not permitted in the oncology unit where Plaintiff worked. Indeed, Defendants claimed it would be illegal to do so.

27.     While Plaintiff never requested perfect compliance with a fragrance-free policy, she did request a sincere effort such that employees and visitors would understand the seriousness of her medical condition and the consequences of potential exposure.

28.     Many, if not most, oncology medical facilities have fragrance-free policies, including upon information and belief, SNHHS affiliate Massachusetts General Hospital.

29.     Instead, Foundation relied on an item in its Dress Code policy listed under "General Requirements" which did not establish a fragrance-free workplace and only prohibited

5

"excessive" cologne, perfume, or smoke odors.

30. On or about January 26, 2018, Foundation sent an email message to department members as a "reminder" regarding the Dress Code, noting that there was a coworker that was highly allergic to strong scents.

31. Upon information and belief, the January 26, 2018 email message was Foundation's only written reminder to employees about avoiding scents in the workplace, and that language only prohibited "excessive" scents.

32. Plaintiff's immediate supervisor and co-workers were very supportive of her condition and willing to make accommodations. They endeavored to inform Plaintiff when a visitor to the department was wearing excessive fragrance.

33. In addition, on the rare occasion when bleach was required to be used to clean an area, such as when a patient has a particular contagion where bleach is the recommended disinfectant by the Centers for Disease Control, Plaintiff's co-workers would close the area and wait to clean it until after her shift ended. Plaintiff's schedule was such that she always finished work around 4 p.m., leaving ample time to clean before the department closed for the day.

34. Even without perfect implementation of reasonable accommodations, Plaintiff performed in her position without significant disruption for approximately nine (9) months.

35. On or around May 2, 2018, Plaintiff was exposed to bleach while at work causing her to be unable to breathe. She used her rescue inhaler, an EpiPen, and was seen at the Southern New Hampshire Medical Center ("SNHMC") Emergency Department ("ED") where she was evaluated and released after approximately four hours.

36. On or around May 23, 2018, Plaintiff experienced a reaction to a cleaning product at work and had difficulty breathing and speaking. She was treated in the SNHMC ER,

6

before being released to go home.

37. The cleaning product used on May 23, 2018 did not contain bleach and had been used successfully in Plaintiff's presence in the past. Unfortunately, however, it was hand mixed on this occasion and due to apparent human error, the concentration was too high, causing an unusually strong odor. Plaintiff returned to work on or before May 25, 2018.

38. Both May 2018 incidents required Defendants to file a claim with their Workers' Compensation insurance carrier due to the medical expenses.

39. On or about May 30, 2018 Defendants gave Plaintiff an ADA Certification Form to be completed by her medical provider. Plaintiff returned the completed form, which confirmed her disability, on or about June 20, 2018.

40. On or about June 20, 2018, Plaintiff was informed that Defendants required her medical provider's opinion on whether her disability was "life threatening" "in order to determine if we can continue to accommodate."

41. Thus, as of at least June 20, 2018, Defendants were contemplating refusing all accommodations to Plaintiff for her disability.

42. On or about July 16, 2018, a coworker grabbed an unlabeled cleaning product that upon information and belief, contained bleach, and had been left in the closet in Plaintiff's department to clean up a spill. The product was used within 10 feet of Plaintiff and caused her to have a severe reaction.

43. The July 2018 bleach exposure was the direct result of Defendants failure and/or refusal to implement reasonable accommodations to Plaintiff as the container with the cleaning product was not labeled to identify that it contained bleach, nor segregated from approved cleaning products that were safe to use near Plaintiff.

7

44. As a result of the bleach exposure Plaintiff was impaired in breathing and speaking, was forced to administer her EpiPen. An ambulance was called to transport her to the SNHMC Emergency Department, Defendant's ED.

45. Plaintiff was released from the ED a few hours later with "Return to Work Instructions" indicating that she was medically cleared to return to work on July 18, 2018.

46. This July 2018 incident also resulted in a Workers' Compensation insurance claim.

47. On or about July 18, 2018, Plaintiff was seen in Defendants' Employee Health and Wellness department to be cleared to return to work. Even though Defendants found no lasting effects from the bleach exposure and their own ED had cleared Plaintiff to return to work, Defendants still refused to permit Plaintiff to return.

48. Thus, on July 18, 2018, Plaintiff was effectively suspended, without pay, because of her disability.

49. On or about July 18, 2010 Defendants demanded documentation from Plaintiff on a "Referral for Medical Evaluation or Information" form, seeking:

   a. "What is the specific ingredient in bleach that triggers these episodes?";

   b. "Is this condition life threatening?"; and

   c. A letter from Plaintiff medical provider on office letterhead outlining her "diagnosis, prognosis, treatment, follow-up plans…"

50. Defendants' request for information about the "life threatening" nature of Plaintiff's condition as well as her prognosis and treatment plans, fall far outside the bounds of the permissible "reasonable documentation" employers are permitted to require from employees, yet Defendants refused to permit Plaintiff to return to work unless she acquiesced to their

demand for this protected health information.

51. Because she had already provided a return to work authorization and further, because these were impermissible inquiries, Plaintiff did not provide the information Defendants demanded. Instead, on or around July 24, 2018, she provided a Health Status Certificate from her medical provider indicating that her medical exam on that date was normal and confirmed that she continued to be healthy enough to return to work.

52. Despite having been cleared by their own Emergency Department and by her physician as being safe and healthy to return to work, Defendants continued to refuse to permit Plaintiff to return to work.

53. Defendants also refused to engage in the interactive process, indeed declaring that they would continue to refuse to participate in the interactive process regarding job accommodation until Plaintiff complied with their demand for information that they are prohibited from seeking under the ADA.

54. On July 26, 2018, Plaintiff's legal representative wrote to Defendants and demanded that Defendants immediately cease their active discrimination against Plaintiff because of her disability and permit her to return to work. In that letter, Plaintiff's attorney also outlined examples of reasonable accommodations that have proven successful with conditions like Plaintiff's.

55. Defendants refused to permit Plaintiff to return to work until October 2, 2018. Plaintiff received no compensation for the two and one-half (2 ½) months that she was unlawfully suspended due to her disability.

56. Plaintiff never requested that Defendants ensure that she would not be exposed to something that might cause a reaction in the workplace.

57. Defendants refused, however, to take simple steps such as implementing a fragrance-free policy. Instead, Defendants relied on an employee Dress Code that only prohibited "excessive cologne, perfume or smoke" and which did nothing to advise visitors to limit their fragrance use.

58. Indeed, after Plaintiff returned to work on or about October 2, 2018, the majority of her exposures, albeit minor, were related to perfume/cologne exposures from other employees or patients/visitors.

59. Upon information and belief, instead of focusing on ensuring that reasonable accommodations were being implemented and adhered to, Defendants undertook a surveillance operation to monitor Plaintiff and document each time she had to be accommodated or her voice was affected by a minor exposure.

60. On or around October 15, 2019, approximately 10 months after her last significant workplace exposure, one of Plaintiff's co-workers attempted to cover up the body odor emanating from a patient by spraying perfume she carried in her purse directly into the air.

61. This direct use of perfume as an air deodorizer caused Plaintiff's most severe reaction at work up to that point, and her co-workers had to provide emergency medical assistance while waiting for an ambulance to transport Plaintiff to the emergency department.

62. Upon information and belief, this October 2019 incident also resulted in a Workers' Compensation insurance claim for Defendants.

63. The co-worker who sprayed the perfume acknowledged that she was aware of the need to use the approved air-fresheners and of Plaintiff's sensitivity to perfumes.

64. Two days later on October 16, 2019, when Plaintiff was medically cleared and would ordinarily have returned to work, she was told instead to report to Employee Health and

Wellness where she was informed that Defendants would not be letting her return to work until a review could be completed to determine whether the environment was safe enough for Plaintiff to continue working there. Defendants claimed that they were scared for Plaintiff's health.

65. Plaintiff heard nothing further from Defendants until October 30, 2019, when she was informed that her employment would be terminated effective November 1, 2019.

**Plaintiff Satisfactorily Performed the Essential Functions of her Position.**

66. Plaintiff was at all times capable of performing the essential functions of her position and, but for the mistakes of other employees and the failure of Defendants to implement stronger policies as accommodations, Plaintiff's employment history establishes that she can work successfully and nearly incident-free.

67. Throughout her employment with Defendants, Plaintiff received positive feedback regarding her job performance, both informally and in formal appraisals.

68. Plaintiff's last formal Performance Appraisal before her wrongful termination, the 2019 SNHH Annual Performance Appraisal was completed on or about October 3, 2019 and recognized that she was a "Strong Contributor" and "excellent nurse" who functioned autonomously, with only occasional direction, and with skill, compassion and precision.

69. Plaintiff's immediate supervisor, Anne Goudreau, who completed the 2019 Performance Appraisal on or about October 3, 2019, commented that Plaintiff is a "pleasure to work with" and that Ms. Goudreau was looking forward to an exciting year ahead working with Plaintiff.

70. Nonetheless, on October 15, 2019, approximately 12 days after the Performance Appraisal was completed, Plaintiff was forced out of work following a medical emergency due to her disability and ultimately wrongfully terminated from her employment on November 1,

2019.

**Plaintiff was Punished for Another Employee's Error and
Replaced by a Less Qualified Employee.**

71. Upon information and belief, the employee who intentionally sprayed perfume in the workplace in violation of the policy against excessive use of fragrances was not disciplined.

72. Plaintiff's termination was the result of a continuing course of discrimination on account of her disability and retaliation for her complaints about that discrimination and requests for accommodation.

73. Upon information and belief, after Plaintiff was fired, she was replaced by a less-qualified nurse who does not have a disability.

74. Upon information and belief, the nurse who replaced Plaintiff was so lacking in the necessary qualifications and certifications for oncology care, that she had never administered chemotherapy before and lacked the necessary certifications to do so even under direct supervision.

75. Upon information and belief, Plaintiff was terminated because of her disability and because of the need for a brief accommodation of one to two days out of work in the event of an inadvertent exposure.

76. Upon information and belief, Plaintiff was also terminated in retaliation for her complaints about Defendants' failure to provide reasonable accommodations and her refusal to acquiesce to impermissible demands for unascertainable information and/or private health information.

77. Upon information and belief, Defendants were motivated, at least in part, to fire Plaintiff due to the multiple workers' compensation insurance claims and increased premiums that resulted from the exposures she suffered at work.

78. As a direct and proximate result of the Defendants' discriminatory actions, Plaintiff has suffered the loss of her employment; suffered a diminution of her professional and personal reputation and her earning capacity; suffered loss of income; suffered loss of health benefits and incurred medical expenses as a result thereof; and has endured emotional pain and suffering which has been harmful to her.  All damages continue to this date.

## COUNT I – DISABILITY DISCRIMINATION

(ADA and NH R.S.A. 354-A)

79. The preceding paragraphs are incorporated by reference herein as if restated in their entirety.

80. Plaintiff had a disability as defined by the ADA and LAD, at the time she was terminated from her employment.

81. Plaintiff's history of sensitivity and/or allergic reactions to perfumes and strong orders limiting her ability to breathe and talk constitute a "record of disability" as defined by the ADA.

82. Plaintiff would have been able to continue performing her job if her condition had been reasonably accommodated by enacting a fragrance-free policy and by affording her time off work without penalty to recuperate in the event of an inadvertent exposure.

83. Defendants' intentionally, with malice and reckless indifference of Plaintiff's rights, violated the ADA by refusing to accommodate her disability and terminating her, despite knowing that the ADA and LAD required such accommodations.

84. Defendants' discriminatory conduct, as more particularly described above, has caused, and continues to cause Plaintiff to suffer substantial physical and mental/emotional distress and inconvenience.

13

85. Plaintiff has incurred damages because of Defendants' conduct.

## COUNT II – DISABILITY RETALIATION

(ADA and NH R.S.A. 354-A)

86. The preceding paragraphs are incorporated by reference herein as if restated in their entirety.

87. Defendants did not act in good faith to assist Plaintiff or accommodate her disability.

88. Defendants failed to engage in good faith in the interactive process.

89. In or around July 2018, Defendants attempted to force Plaintiff to abandon her employment by suspending her, without pay, for approximately two and one-half months after she suffered from an exposure at work that was directly caused by Defendants failure to implement or adhere to reasonable accommodations.

90. Defendants did not permit Plaintiff to return to work, even though she had been medically cleared to do so by their own ED physician.

91. Plaintiff opposed Defendants' discriminatory conduct and engaged counsel to assert disability claims.

92. After she returned to work, Defendants began to track Plaintiff and plan future retaliation in a continuation of the discriminatory conduct she experienced in 2018.

93. Defendants' discriminatory conduct, as more particularly described above, has caused, and continues to cause, Plaintiff to suffer substantial physical and mental/emotional distress and inconvenience.

94. Plaintiff has incurred damages because of Defendants' conduct.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff seeks the following relief:

- a. A declaration that her rights under the ADA and LAD were violated;
- b. Any actual monetary losses sustained by the Plaintiff as a direct result of the violations, with interest;
- c. Restoration and make-whole relief for the loss of employment benefits or compensation denied or lost by Plaintiff;
- d. Reinstatement with seniority and any promotional opportunities she would have had but for the discriminatory conduct;
- e. An Order prohibiting the Defendants from any further prohibited discrimination against her;
- f. Compensatory damages against Defendants because of the past and future physical and mental pain and distress caused by their discriminatory and retaliatory actions;
- g. Punitive damages because Defendants acted with malice and reckless indifference of Plaintiff's rights;
- h. Attorney's fees, litigation expenses and costs incurred in obtaining relief and pursuing this action;
- i. Post-judgement interest; and
- j. Any other relief the Court deems just and proper.

**The Plaintiff Demands a Jury Trial.**

Dated: November 24, 2020              Respectfully submitted,

                                     MONIQUE REMILLARD
                                     By her attorney:

                                     /s/ _____
                                     Kamee B. Verdrager, Esq. (NH #21266)
                                     KBV LAW
                                     1 Hardy Road, #109
                                     Bedford, NH 033110
                                     (617) 340-3115 (phone)
                                     kbv@kbvlawpc.com