UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


MONIQUE REMILLARD,

  Plaintiff,

v.           Civil Case No. 1:20-cv-1141-SE-TSM


SOUTHERN NEW HAMPSHIRE
HEALTH SYSTEM, INC. and
FOUNDATION MEDICAL
PARTNERS, INC.

  Defendants.


## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### I.  Preliminary Statement

Defendants SOUTHERN NEW HAMPSHIRE HEALTH SYSTEM, INC. (hereinafter

"SNHHS") and FOUNDATION MEDICAL PARTNERS, INC. (hereinafter "FMP"), submit that

they are entitled to judgment in their favor for the claims brought by Plaintiff Monique Remillard

("Remillard").  Remillard cannot produce "specific, competent" evidence for which a reasonable

fact-finder could determine that she was discriminated against on the basis of a disability or that

she was terminated in retaliation for requesting an accommodation.  As detailed below,

Defendants, in good faith, engaged in the interactive process with Remillard for over a year and a

half in an effort to find reasonable accommodations for her severe allergy to fragrances and

chemicals.  It was only when Remillard suffered a life-threatening incident that required

immediate intervention by a physician employed by Defendants that she was terminated.

Remillard's claims are baseless, and Defendants ask the Honorable Court to grant Defendants

summary on both of Remillard's claims.

## II. Local Rule 56.1 Statement of Undisputed Material Facts ("SUMF")[1]

1. In her employment application to FMP dated July 11, 2017, Remillard stated that her reason for leaving her previous employer, Dartmouth Hitchcock NC Cancer Center ("DHMC"), was that she moved to Nashua, and she omitted the fact that she was terminated by DHMC on June 21, 2017 for unplanned absences and unplanned occurrences of arriving late or leaving early. Remillard Ex. 5 (Aff. Ex.[2] 1); Remillard Ex. 4 (Aff. Ex. 2); Remillard Tr. (Aff. Ex. 3) 54:5-13; 57:22-59:3.

2. Remillard suffered an allergic reaction to a fragrance at DHMC in October 2015, at which time Remillard described DHMC as having a fragrance-free policy in place. Aff. Ex. 3 at 48:4-50:17, 67:22-68:8, 68:23-69:10; Remillard Ex. 3 (Aff. Ex. 4); Pl. Int. Answers (Aff. Ex. 5), No. 10.

3. Remillard's Medical Evaluation Questionnaire dated August 22, 2017 stated that she did not currently take any medication for breathing problems. Remillard Ex. 6 (Aff. Ex. 6).

4. Remillard began her employment with FMP on September 11, 2017 as a part-time Hematology/Oncology Registered Nurse, and Anne Goudreau, Remillard's manager, gave Remillard positive performance evaluations, including right before her termination. Goudreau Ex.1 (Aff. Ex. 7), Ex. 2 (Aff. Ex. 8), Aff. Ex. 3 at 142:1-11, Goudreau Tr. (Aff. Ex. 9) at 20:11-23:11.

5. Goudreau described Remillard as an excellent and well-liked nurse. Aff. Ex. 9 at 61:5-8.

6. Communication with patients and caregivers was an essential function of Remillard's registered nurse job description. Aff. Ex. 9 at 24:16-25:21; Goudreau Ex. 3 (Aff. Ex. 10).

---

[1] Defendants submit this Statement of Undisputed Material Facts for summary judgment purposes only and reserve the right to challenge or dispute Plaintiff's factual allegations at the time of trial.
[2] "Aff. Ex." is a reference to the Exhibits attached to the Affidavit of Kimberly M.R. Sullivan submitted in support of the Motion for Summary Judgment.

7. Ms. Goudreau contacted Employee Health after observing Remillard's reactions in the fall of 2017 that caused Remillard to lose her voice and sometimes not be able to communicate with patients after being exposed to fragrances.  Aff. Ex. 9 at 16:5-17:14.

8. On January 25, 2018, Remillard was seen in Employee Health by Pamela Fallon, Nurse Practitioner, where Ms. Fallon reviewed with Remillard her chemical sensitivities.  Fallon Ex. 2 (Aff. Ex. 11).

9. Following Ms. Fallon's meeting with Remillard, Ms. Fallon called Ms. Goudreau on January 25, 2018, to discuss Remillard's requests that her department order a bathroom deodorizer, post signs, remove scented decorations in the lab, and have a charge nurse speak to family members and patients who wore scents.  Aff. Ex. 11; Aff. Ex. 5, No. 6.

10. Ms. Goudreau informed Ms. Fallon during the call that she was aware of Remillard's bleach sensitivity and that they treated areas after Remillard had left the unit.  Aff. Ex. 11; Aff. Ex. 9 at 50:9-51:7.

11. Ms. Fallon sent Remillard an email on January 25, 2018, outlining the changes Ms. Goudreau was willing to make in order to keep the environment safe for Remillard.  Remillard Ex. 7 (Aff. Ex. 12).

12. On January 26, 2018, Kathleen Hamson, Remillard's Practice Manager, sent an email to Remillard and her coworkers, which stated that there was "a coworker who is highly allergic to strong scents and we would appreciate everyone's cooperation in making this a safe work environment for her."  Remillard Ex. 8 (Aff. Ex. 13).

13. The January 26, 2018 email stated: "Please remember that we are all required to abide by the Health System Dress Code Policy. . . .  Of particular importance are the first two items listed under 'General Requirements' on page 2 which read as follows:  A. Employees are expected

to be clean, odor free and neat in appearance at all times. B. Scents and body odor, including excessive cologne, perfume, or smoke, are not acceptable in the workplace." Aff. Ex. 13.

14. The January 26, 2018 email concluded: "There have been no instances to date from staff not following this policy; I am just sending this as a friendly reminder." Aff. Ex. 13.

15. Remillard did not inform Ms. Hamson in response to this email that she believed there were coworkers who were not complying with the Dress Code Policy. Aff. Ex. 3 at 86:14-87:11.

16. Ms. Goudreau recalled that the staff completely refrained from wearing fragrances. Aff. Ex. 9 at 56:17-57:10.

17. Employees in Remillard's department avoided using products known to contain bleach in Remillard's presence. Aff. Ex. 9 at 51:1-19.

18. Defendants clearly labeled cleaning supplies under their control that contained bleach. Aff. Ex. 9 at 58:8-22, 64:9-20.

19. Following her call with Ms. Fallon, Ms. Goudreau spoke to someone in the lab to ensure that decorations were taken down, and Remillard agreed that the scented decorations hanging in the lab were removed following her conversation with Ms. Fallon. Aff. Ex. 9 at 51:1-19; Aff. Ex. 3 at 77:7-22, Aff. Ex. 5, No. 6.

20. Ms. Goudreau ordered from Defendants' medical supplier a nonaerosol unscented bathroom freshener to put in the bathrooms, consistent with Remillard's request. Aff. Ex. 9 at 51:20-52:2, Aff. Ex. 3 at 77:1-6, Aff. Ex. 5, No. 6.

21. Either Ms. Goudreau or her resource nurse would speak to patients or family members who came in wearing a noticeable scent, explaining that there was a nurse with severe allergies to fragrances and asking that they please refrain from wearing them in the future. Aff. Ex. 9 at 52:3-53:10; 56:17-57:10; Goudreau Ex. 7 (Aff. Ex. 14) Bailey Tr. (Aff. Ex. 15) 90:22-92:16.

22. If the front desk noticed patients or family members with strong fragrances, the department would seat any such individual in an area away from Remillard.  Aff. Ex. 9 at 52:9-21, Aff. Ex. 5, No. 6; Aff. Ex. 14.

23. All of the employees who worked at the front desk were aware that they needed to report a patient or visitor wearing a fragrance.  Aff. Ex. 9 at 57:11-58:7; Aff. Ex. 14.

24. There were times that Remillard's coworkers did not perceive a scent that was noticeable to Remillard, which led on occasion to a patient being seated near Remillard with a scent that was noticeable to her but not her coworker.  Aff. Ex. 3 at 93:3-20, 129:21-131:3.

25. Ms. Goudreau also spoke to her staff about the procedures in place to protect Remillard.  Aff. Ex. 9 at 58:8-59:11, 68:17-69:21; Aff. Ex. 14.

26. The only accommodation requested by Remillard in January 2018  that was not implemented was placing signs in the patient areas.  Aff. Ex. 9 at 54:2-12; Aff. Ex. 15 at 66:17-67:16.

27. Despite Defendants' efforts to put in place accommodations to keep Remillard safe, on May 2, 2018, Remillard was at the nurses' station when the odor of bleach vented through from a closed room where equipment was being cleaned with bleach.  MR00155 (Aff. Ex. 16); Basta Ex. 4 (Aff. Ex. 17).

28.  Remillard had an anaphylactic reaction to the bleach on May 2, 2018, which required her to be sent to the Emergency Department ("ED").  Aff. Exs. 16-17.

29. On May 23, 2018, Remillard was seen in the ED again when she experienced a reaction to the cleaning product Stride SC Neutral Cleaner being used in the Pharmacy area of the office.  Basta Ex. 6 (Aff. Ex. 18).

30. During the May 23rd incident, Remillard used her rescue inhaler, had a nebulizer treatment and took her EpiPen before she was taken to the ED.  Remillard Ex. 10 (Aff. Ex. 19).

31. Ms. Basta was concerned because the product that Remillard reacted to on May 23, 2018 was not something to which Remillard had disclosed she was allergic, so Ms. Basta wondered if there were substances other than bleach, ChloraPrep and perfumes to which Remillard was also allergic.  Basta Tr. (<u>Aff. Ex. 20</u>) 40:21-41:11.

32. The Pharmacy discontinued using the Stride SC Neutral Cleaner product that caused Remillard's reaction on May 23, 2018.  Aff. Ex. 20 at 41:12-15.

33. Remillard agreed that the Pharmacy was working on measures to help prevent reactions.  Aff. Ex. 3 at 95:4-7.

34. After this second reaction in a two-week period, on May 30, 2018, Joan Basta, the Director, Employee Health and Wellness Services, met with Remillard to discuss her chemical sensitivities.  Aff. Ex. 20 at 36:20-39:14.

35. During the meeting on May 30, 2018, Remillard advised Ms. Basta that the staff have been supportive regarding her sensitivities and did not use perfume or products with strong odors on account of her allergy.  Aff. Ex. 19; Aff. Ex. 3 at 100:3-12.

36. Ms. Basta took notes from the May 30, 2018 meeting, which state "[t]his being the second incident in two weeks that the employee has had to go to the ED is very concerning to employee's manager and manager has voiced concern about how to keep the employee safe in the environment."  Aff. Ex. 19.

37.  Ms. Basta provided Remillard with an ADA Certification Form during the May 30, 2018 meeting.  Aff. Ex. 19; Aff. Ex. 20 at 42:2-14.

38. Remillard's ADA certification paperwork dated June 18, 2018, which stated that she was impaired in the life activities of "speaking" and "breathing."  Basta Ex. 8 (<u>Aff. Ex. 21</u>).

39. The ADA certification stated as requested accommodations:  "No bleach or other designated

chemicals to be used in the employee's presence, notifying the employee of any persons wearing perfumes/colognes."  Aff. Ex. 21.

40. On June 20, 2018, Ms. Basta emailed Remillard acknowledging receipt of the ADA certification and advising that Defendants also needed to know if Remillard's provider considered the chemical sensitivity "life threatening."  Basta Ex. 9 (Aff. Ex. 22).

41. The inquiry regarding whether Remillard's chemical sensitivity was life threatening was based on the seriousness of her reactions, which impacted her ability to breathe and were very concerning to Defendants. Aff. Ex. 20, 45:21-5, 48:12-18, 49:1-5, 50:8-16; 54:12-55:2.

42. Ms. Bailey (HR) attempted to schedule a meeting with Remillard and Employee Health in July 2018, but Remillard postponed the meeting.  Remillard Ex. 11 (Aff. Ex. 23), Def. Int. Answers (Aff. Ex. 24), No. 6.

43. While waiting for the additional information from Remillard's medical provider, Remillard suffered another incident on July 16, 2018.  Remillard Ex. 12 (Aff. Ex. 25), Aff. Ex. 3 at 106:15-107:14.

44. The July 16, 2018 reaction was caused by a staff member who took an unmarked bottle of cleaner out of the janitor's closet, which, unknown to Defendants contained bleach, in order to assist a volunteer in cleaning up a spill.  Aff. Ex. 25; Aff. Ex. 20 at 68:18-69:14.

45. Remillard immediately had difficulty breathing and, in response, took her inhaler, Benadryl, nebulizer treatment, and EpiPen.  Aff. Ex. 25; Aff. Ex. 9 at 88:23-89:13.

46. Remillard continued to have difficulty with breathing, so 911 was called, and she went to the ED by ambulance.  Aff. Ex. 25; Aff. Ex. 9 at 88:23-89:13.

47. Remillard was placed on oxygen in route to the ED on July 16, 2018.  Remillard Ex. 14 (Aff. Ex. 26); Aff. Ex. 3 at 114:17-115:3.

48. Ms. Goudreau believed that Remillard's condition was life threatening after the July 16, 2018 event because Remillard could not breathe and did not improve with the EpiPen over several minutes. Aff. Ex. 9 at 88:23-89:19, 90:3-19.

49. Ms. Goudreau observed at this time that Remillard's condition was worsening, because each reaction was getting more severe. Aff. Ex. 9 at 89:14-19.

50. Remillard used the EpiPen during a reaction always as last resort, and normally using the EpiPen one time would be sufficient to stabilize her. Aff. Ex. 3 at 108:13-109:5.

51. The unmarked container that caused the severe reactions in July 2018 was in the janitor's closet that was stocked and maintained by an outside janitor service. Aff. Ex. 9 at 64:9-20, 70:2-6; Aff. Ex. 20 at 70:13-18.

52. After the incident, someone from Defendants spoke with the janitorial company to ensure that all products were labeled. Aff. Ex. 9 at 64:9-65:2.

53. Remillard was also cautioned not to go in the janitor closet at all because bleach was kept in that closet by the outside janitorial service. Aff. Ex. 9 at 65:3-8.

54. On July 18, 2018, Remillard had a return-to-work meeting with Ms. Basta, and Remillard advised Ms. Basta that she was working on obtaining documentation clearing her to return to work. Basta Ex. 13 (Aff. Ex. 27), Aff. Ex. 20 at 75:9-76:23.

55. Ms. Basta advised Remillard during the July 18, 2018 meeting that she would not be able to return to work until Defendants received return-to-work clearance documentation, as well as her provider's answers to the previously-requested questions. Aff. Ex. 27; Aff. Ex. 20 at 75:9-76:23.

56. During the July 18, 2018 meeting, Ms. Basta provided Remillard with a Medical Evaluation form, which directed her provider to answer the following questions by July 27, 2018:

"What is the specific ingredient in bleach that triggers these episodes?" and "is this condition life threatening?"   Aff. Ex. 27; Basta Ex.16 (<u>Aff. Ex. 28</u>); Aff. Ex. 20 at 78:9-79:5.

57. On July 26, 2018, Defendants received a letter from Remillard's attorney advising that Remillard would not be providing answers to the two questions on the Medical Evaluation Form.  Basta Ex. 17 (<u>Aff. Ex. 29</u>).

58. On July 31, 2018, Remillard's practice manager, Ms. Hamson, emailed Ms. Bailey a list of accommodations Remillard's group had already put in place to make her environment as safe as possible.  Basta Ex. 10 (<u>Aff. Ex. 30</u>), Aff. Ex. 24, No. 5.

59. Attorneys for Defendants and Remillard exchanged correspondence during July and August 2018 concerning Defendants' request for additional information from Remillard's provider. See, e.g., Basta Ex. 20 (<u>Aff. Ex. 31</u>).

60. On September 20, 2018, Ms. Hamson, Ms. Goudreau, Ms. Basta, and Ms. Bailey had a meeting to perform a walkthrough of Remillard's practice and review the accommodations in place for Remillard.  Aff. Ex. 20 at 93:6-94:13, 95:10-96:19; Basta Ex. 21 (<u>Aff. Ex. 32</u>); Aff. Ex. 15 at 53:7-54:10, 68:11-71:20; Aff. Ex. 9 at 76:6-78:19.

61. The meeting summary reflects that Ms. Goudreau stated that "staff are very concerned and frightened when Monique has these reactions" and that the department felt like it cannot control every scenario, especially the fragrance issue.  Aff. Ex. 32, Aff. Ex. 9 at 75:5-76:5.

62. Ms. Bailey sent the September 20, 2018 meeting summary to Sarah McGhee, and noted that Remillard had a reaction to Stericlean, which does not contain bleach, and that this prompted the request to her medical provider to identify the specific substances that are triggers. Remillard Ex. 15 (<u>Aff. Ex. 33</u>).

63. Ms. Basta believed that the accommodations in place for Remillard at this time were

manageable, but also believed there was a human element where the practice could not predict everything that might happen.  Aff. Ex. 20 at 101:1-13.

64. Ms. Basta denied that the goal of Remillard being out of work from July 16, 2018 to October 2, 2018 was for Remillard to choose not to come back to work.  Aff. Ex. 20 at 103:4-8.

65. Ms. Basta never discussed Remillard's worker's comp claims, and her concern was Remillard's safety.  Aff. Ex. 20 at 91:5-8.

66. On September 13, 2018, Defendants received a letter dated September 10, 2018 from Remillard's physician, which stated that Remillard's condition could be accommodated by not being exposed to bleach or bleach products, fragrances such as colognes and perfumes, and improperly mixed cleaning products.  Basta Ex. 23 (Aff. Ex. 34).

67. Following receipt of the physician the letter, attorney for Defendants, Deb Ford, sent a letter to Remillard's attorney on September 26, 2018, agreeing that Remillard could return to work in her former position.  Aff. Ex. 3 at 122:15-18; DEF 001233-34 (Aff. Ex. 35).

68. The September 26th letter stated that Defendants "cannot give assurances that Ms. Remillard will not at some point be exposed to either bleach or a bleach product, or a fragrance worn by a patient or an employee."  Aff. Ex. 35.

69. The September 26th letter stated: "the practice has asked, and will continue to ask, patients to refrain from wearing fragrances, but the practice could not absolutely control the actions of patients or guarantee that Ms. Remillard not be exposed to a fragrance." Aff. Ex. 35.

70. The September 26th letter concluded: "SNHHS will continue to work with Ms. Remillard to accommodate her chemical sensitivity issues but, as set forth above, it cannot guarantee her safety or that she will not at some point be exposed to an agent that may cause a reaction." Aff. Ex. 35.

71. On September 27, 2018, Remillard's attorney sent a letter in response, stating that Remillard would return to work under the conditions set forth in the September 26, 2018 letter. DEF000582-83 (Aff. Ex. 37).

72. The September 27, 2018 letter stated: "Ms. Remillard fully understands that SNHHS cannot offer her a guarantee that she will not be exposed to a triggering chemical, nor does she expect it." Aff. Ex. 37.

73. The September 27, 2018 letter also recognized that bleach was recommended by the CDC for cleaning C-diff and asked that Defendants continue the practice of closing off an area where a C-diff patient had been until Remillard had left for the day. Aff. Ex. 37.

74. The September 27, 2018 letter did not ask that the practice prevent patients or employees from wearing scents altogether, and it did not ask that the practice display signs concerning fragrances. Aff. Ex. 37.

75. The September 27, 2018 letter was sent to Ms. Goudreau. DEF 000680-82 (Aff. Ex. 36).

76. Once Remillard returned to the workplace, Ms. Goudreau believed that the department was able to accommodate Remillard's allergies. Aff. Ex. 9 at 94:12-95:7.

77. Upon Remillard's return, Defendants documented events related to accommodations made for Remillard and Remillard's allergic reactions. Aff. Ex. 9 at 91:8-93:21, Goudreau Ex. 9 (Aff. Ex. 38), Aff. Ex. 15 at 86:19-87:2.

78. Following her return to work, Remillard experienced reactions to individuals wearing scents that left her with a raspy voice such that she had to whisper to patients in her care, including on October 5, 2018 and October 24, 2018. Aff. Ex. 38.

79. Following her return to work, Defendants complied with Remillard's request that the cleaning of areas exposed to C-diff patients take place after Remillard had left for the day,

including on October 4th, 12th, 16th, and 19th.  Aff. Ex. 38.

80. On October 24, 2018, Ms. Basta spoke with Remillard and asked how she was doing with the current accommodations since her return to work.  Remillard Ex. 16 (Aff. Ex. 39); Aff. Ex. 3 at 122:21-124:3, Aff. Ex. 20 at 104:10-105:1.

81. Ms. Basta's notes from the October 24, 2018 call state that she asked Remillard about the accommodation of not cleaning with bleach products in her presence, and Remillard stated that it was going well and that she had not had any issues.  Aff. Ex. 39.

82.  Ms. Basta's notes from the October 24, 2018 call also state that she asked Remillard if any other accommodations were needed, in addition to the ones already in place, and Remillard replied "no."  Aff. Ex. 39; Aff. Ex. 20 at 66:21-67:8.

83. Remillard did not recall the call with Ms. Basta, but did not deny it, and testified that "at that point in time everything probably did seem fine."  Aff. Ex. 3 at 123:2-124:10.

84. On November 2, 2018, Remillard had a reaction to a patient wearing perfume that no one else noticed as strong, and the reaction caused Remillard's voice to be reduced to a hoarse whisper for the remainder of the day.  Aff. Ex. 38.

85. On December 19, 2018, Remillard left work early at 12:45 pm when she reacted to a visitor's perfume that one else in the area had detected.  Aff. Ex. 38, Remillard Ex. 18 (Aff. Ex. 40).

86. On October 15, 2019, over a year after her return in October 2018 without a trip to the ED, Remillard experienced her most severe reaction when an employee in the lab sprayed a fragrance from her purse.  Remillard Ex. 19 (Aff. Ex. 41), Aff. Ex. 3 at 132:16-134:5.

87. Remillard took Benadryl, her albuterol inhaler, and was given an albuterol nebulizer treatment in a private office by an RN.  Aff. Ex. 41, Aff. Ex. 3 at 132:16-134:5.

88. Remillard administered one EpiPen, but there was no effect, so another staff administered a

second EpiPen. Aff. Ex. 41, Aff. Ex. 3 at 132:16-134:14.

89. Remillard did not believe that she had ever needed to use a second EpiPen previously in response to an allergic reaction.  Aff. Ex. 3 at 134:15-18.

90. 911 was called, and Dr. Chun, a physician from the practice, had to start an IV to help open Remillard's airway before 911 arrived because Remillard had no air exchange.  Aff. Ex. 41, Aff. Ex. 20 at 107:8-13, Bailey Ex. 18 (Aff. Ex. 42).

91. Following the incident, Dr. Chun asked to speak to someone in HR because she was very concerned that she would not have been able to intubate Remillard; it had taken two nurses, an MA and Dr. Chun to stabilize Remillard.  Aff. Ex. 42.

92. Ms. Basta recalled Dr. Chun being very upset and concerned that she was not going to be able to maintain Remillard's airway.  Aff. Ex. 20 at 110:20-111:6.

93. Remillard's coworkers told her that they had to give her more medication in response to the October 15, 2019 incident than they had to in past.  Aff. Ex. 3 at 136:4-8.

94. Amy Schreib, a nurse present on October 15th, sent Remillard a text stating that she should contact her allergist because it did not seem like the EpiPen helped at all during the October 15th reaction.  Remillard Ex. 20 (Aff. Ex. 43), Aff. Ex. 3 at 136:21-137:19, 139:21-140:4.

95. On October 17, 2019, Remillard was seen by Ms. Fallon and Ms. Basta for a return-to-work evaluation.  Fallon Ex. 9 (Aff. Ex. 44), Fallon Tr. (Aff. Ex. 45) 12:1-20, Aff. Ex. 20 at 106:9-107:7.

96. During the October 17th meeting, Ms. Fallon and Ms. Basta expressed their concern that the October 15th incident required emergent care by a physician, and they also informed Remillard that many of her co-workers who were present for the incident expressed their concern about Remillard's health.  Aff. Ex. 44, Aff. Ex. 20 at 106:19-107:7.

97. Ms. Basta and Ms. Fallon both observed that Remillard looked very pale and not well at the October 17 meeting, and they informed Remillard that she was not cleared to return to work at that time. Aff. Ex. 44, Aff. Ex. 20 at 106:19-107:7, Aff. Ex. 45 at 12:9-20.

98. The decision not to allow Remillard to return to work was based on how she presented that day and the seriousness of the incident. Aff. Ex. 20 at 106:19-107:7, 109:19-23, 121:2-7; Aff. Ex. 45 at 38:21-39:9, 40:23-41:13, 44:1-8, 46:1-10; Aff. Ex. 15 at 98:20-99:15.

99. On October 20, 2019, Remillard sent an email to Ms. Basta and Ms. Goudreau, checking if she could return to work and stating that since it had been over a year since an exposure caused Remillard to be sent to the ED, "[t]his proves that the accommodations we had in place are working effectively." Basta Ex. 25 (Aff. Ex. 46).

100. Following the October 15th incident, Ms. Basta expressed her concerns that Defendants could not keep Remillard safe at work. Aff. Ex. 20 at 113:1-8, 115:8-116:23.

101. Following the October 15th incident, Ms. Goudreau informed HR or EH that she did not believe they could provide Remillard with a safe environment. Aff. Ex. 9 at 98:7-99:3.

102. After discussions among Remillard's managers, Employee Health and HR, along with guidance from legal counsel, the decision was made that Defendants could no longer employ Remillard safely given the severity of Remillard's reaction to the life-threatening event of October 15, 2019. Aff. Ex. 15 at 17:4-18:21, 104:5-105:2, 109:16-110:1, 113:14-114:21.

103. Remillard's employment was terminated on October 31, 2019, and she was advised at the time that she was not eligible for re-hire for any nursing positions that were patient facing due to the same concerns that led to her termination following the life-threating incident on October 15, 2019. Aff. Ex. 15 at 120:22-122:13.

104. At the time of Remillard's termination from employment, all of Defendants' nursing

positions were patient facing.  Aff. Ex. 15 at 117:9-21.

105.    Remillard testified that she has not looked for or applied to any remote or online nursing

positions since her termination "[b]ecause they were not the type of job I wanted.  I wanted

to be bedside or chair-side and using my oncology knowledge."  Aff. Ex. 3 at 29:11-33:9.

106.    Remillard has not been employed since her termination, and she has not applied to any

nursing positions since late 2019 or early 2020, when she recalls applying to S. Joseph's and

SNHHS.  Aff. Ex. 3 at 12:19-13:3, 21:3-29:10; Aff. Ex. 5, Nos. 20-21.

107.    The employee who had sprayed the fragrance that led to Remillard's reaction on October

15, 2019 was not disciplined because it was determined that it was a spontaneous, non-

intentional reaction to a patient with a strong body odor.  Aff. Ex. 15 at 92:17-94:2.

### III.    STANDARD OF REVIEW

The movant has the initial burden of presenting evidence that "[i]t believes

demonstrate[s] the absence of a genuine issue of material fact," and if that burden is met, the

plaintiff must designate "specific facts" showing that there are trial-worthy issues.  *Celotex Corp.

v. Catrett*, 477 U.S. 317, 323 (1986). Accord *Flovac, Inc. v. Airvac, Inc.,* 817 F.3rd 849, 853 (1st

Cir. 2016).

### IV.    ARGUMENT

#### A.  Remillard's Claim of Disability Discrimination (Count 1) Fails as a Matter of Law

In order to establish a claim of disability discrimination under the ADA, Remillard must

demonstrate that: (1) she is an individual with a "disability" within the meaning of the statute; (2)

she is a "qualified individual"; and (3) she suffered an adverse employment action because of her

disability.  42 U.S.C. § 12112(a); *see also Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 104 (1st

Cir. 2005).  A qualified person is an "individual with a disability who, with or without

15

reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). If the plaintiff makes her *prima facie* case of discrimination, the employer must articulate a legitimate non-discriminatory reason for taking the adverse employment action claimed. *McDonnell Douglas*, 411 U.S. at 802. Once the employer articulates its non-discriminatory reason, the plaintiff must prove that the employer's stated reasons are merely a pretext for the discrimination. *Id*. at 802-04. The ultimate burden of proving unlawful discrimination rests at all times with the plaintiff. *Tobin*, 433 F.3d at 105.

### 1. Defendants Attempted to Reasonably Accommodate Remillard's Disability

Under the ADA unlawful discrimination includes the failure to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship on the employer. *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999); *Hughes v. Southern New Hampshire Services*, 2012 U.S. Dist. LEXIS 167148 at *7 (D.N.H. 2012). Plaintiff bears the burden of proposing an accommodation that would enable her to perform her job effectively and is, at least on the face of things, reasonable. *Wallace v. N.H. Ball Bearings, Inc.*, 2022 U.S. Dist. LEXIS 17158, *17 (D.N.H. Jan. 31, 2022).

To avoid summary judgment on her reasonable accommodation claim, the burden is on Remillard to "[s]how that [Defendants] knew about plaintiff's disability and did not reasonably accommodate it." *Isaacs v. Dartmouth-Hitchcock Medical Center*, 2014 U.S. Dist. LEXIS 54183 at * 19 (D. N.H. 2014); *Montemarlo v. Goffstown School District*, 2013 U.S. Dist. LEXIS 143826 at * 14-15 (D. N.H. 2013). The law is clear that an employer is not required to simply grant an accommodation. *See Enica v. Principi*, 544 F.3d 328, 342 (1st Cir. 2008) ("an employer is neither required to provide an employee with an accommodation of her choice nor to create a new position for that employee"); *Williams v. HealthReach Network*, 2000 U.S. Dist. LEXIS

9695, at *11 n.11 (D. Me. Feb. 22, 2000) ("the ADA . . . does not require an employer to . . . provide an employee an accommodation of the employee's choice").

There is no question that Defendants reasonably accommodated Remillard here. Beginning on January 25, 2018, Defendants continually engaged Remillard in the interactive process regarding the best way to allow her to perform the essential functions of her position safely. SUMF ¶¶ 7-8. Based on these discussions, Defendants implemented various accommodations to reduce Remillard's exposure to fragrances and chemicals to which she could experience an adverse reaction. These accommodations included switching to more expensive cleaning products, asking employees and patients not to wear fragrances in the office, and separating Remillard to the extent possible from all patients who used scents. SUMF ¶¶ 9-25. Defendants also restricted cleaning with bleach products until after Remillard had left for the day or, if such cleaning could not be postponed, sending Remillard home with pay. SUMF ¶ 79.

The majority of Remillard's requests for accommodations were granted and effective, as Remillard herself conceded in her communications with Employee Health after her return to work on October 2, 2018. SUMF ¶¶ 80-82. The effectiveness of the accommodations that were implemented is underscored by the fact that upon her return from leave on October 2, 2018, it was over a year later, on October 15, 2019, when Remillard suffered another severe allergic reaction. Indeed, Remillard stated in an email on October 20, 2019 that "the accommodations we had in place are working effectively." SUMF ¶ 99.

While Remillard's requests for signs to be posted and a completely "fragrance-free" policy were not implemented, these accommodations were not requested again when Remillard returned to work on October 2, 2018. SUMF ¶¶ 74-75. Moreover, the fact that Remillard suffered an allergic reaction at DHMC when it, according to Remillard, had fragrance-free

policies in place, SUMF ¶ 2, supports that such additional accommodations enacted by

Defendants would not have been reasonable or effective. Such policies would also have been a

hardship to a practice that treated cancer patients. It is not reasonable for Defendants to turn

away a patient in need of cancer treatment because that individual (or the person accompanying

him or her) happens to be wearing a fragrance.

Indeed, other courts have recognized that a fragrance-free workplace is objectively

unreasonable. For example, the Sixth Circuit Court of Appeals explained:

> A 'fragrance-free' work environment still purports to require her employer to
> engage in the undue burden of establishing and enforcing a prohibition against 'scents.'
> This imposes an obligation on her employer to prohibit plaintiff's co-workers and those
> who occasionally come into the office of their right to wear 'scents,' to engage in the
> burdensome and unseemly task of enforcing such a prohibition and to identify and rid
> plaintiff's workplace of many other common, scent producing agents such as cleaning
> supplies.

*Montenez-Denman v. Slater,* 2000 U.S. App. LEXIS 3303, *6 (6th Cir. Mar. 1, 2000); *see also*

*Jimenez-Jimenez v. Int'l Hospitality Grp.,* 2017 U.S. Dist. LEXIS 198315, *26 (D.P.R. Nov. 30,

2017) ("it seems highly impractical to police the scents that both employees and clients use.").

In *Kaufmann v. GMAC Mortg. Corp.*, the court held that the employee sought "a

completely scent-free environment to be policed by her supervisors and enforced with

disciplinary punishments," which would "impose undue financial and administrative burdens."

2006 U.S. Dist. LEXIS 30615, 41-42 (E.D. Pa. May 17, 2006), aff'd 229 F. App'x 164, 13 (3d

Cir. 2007). The *Kaufmann* court continued that: "An employer is not required by the ADA to

create a wholly isolated work space for an employee that is free from numerous possible irritants,

and to provide an unlimited absentee policy." *Id*. at *13.

Here, the record is clear that Defendants made reasonable accommodations to prevent

Remillard's exposure to fragrances, and that the accommodations with respect to bleach were

also reasonable and effective. SUMF ¶¶ 11-26, 32-33, 51-53, 60-63. The fact that Remillard

experienced reactions does not undermine the reasonableness of the accommodations in place, as recognized by Remillard at the time she returned from her leave in October 2018.

If Remillard alleges that Defendants did not reasonably accommodate her because she was not transferred to another position, this would similarly fail as a matter of law. Though the ADA specifically provides reassignment to a vacant position as a form of reasonable accommodation, an employee must demonstrate that a vacant position existed and that she was qualified for it. *Wallace*, 2022 U.S. Dist. LEXIS 7158, *21. First, Remillard never requested a transfer to another position at the time. Second, a transfer to an alternative patient-facing nursing position did not address the underlying issue of potential exposure to fragrances and chemicals to which she suffered severe allergic reactions. For this reason, Remillard was advised at the time of her termination that she would not be eligible to be hired for other nursing positions with Defendants. SUMF ¶ 103. Indeed, Remillard would not have been "qualified" under the ADA for other positions because similarly no accommodations would have enabled her to perform the functions safely without the risk of a life-threatening incident.

To the extent Remillard tries to argue that she should have been transferred to a remote position, she has not established that there was a remote position available at the time, SUMF ¶ 104, and she testified that she never applied for or considered remote positions following her termination because she wanted to be a chair-side oncology nurse. SUMF ¶ 105 . In fact, Remillard testified that she has not applied to any nursing positions since late 2019 or early 2020 and that she has not been employed since her termination. SUMF ¶ 106. Thus, it is undisputed that Remillard has utterly failed to mitigate her damages, and this precludes any claim for back pay or lost wages. *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 15-16 (1st Cir. 1999) ("We believe it will be the extraordinary case in which an ADA claimant's decision to withdraw from the job

market can be found to have been justifiable, given that virtually all reemployment prospects are plainly precluded absent some effort to reenter the job market."); *see also Rooney v. Sprague Energy Corp.*, 2008 U.S. Dist. LEXIS 48370 (D. Me.).

*i. Remillard Failed to Engage in the Interactive Process*

Beginning in the summer 2018, Remillard failed to provide the requested medical information that was necessary for Defendants to provide a safe work environment for her following her two severe reactions in May 2018, and then again on July 16, 2018.  SUMF ¶¶ 42, 54-57.

"If an employer engages in an interactive process with the employee, in good faith, for the purpose of discussing alternative reasonable accommodations, but the employee fails to cooperate in the process, then the employer cannot be held liable under the ADA for a failure to provide reasonable accommodations."  *E.E.O.C. v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 132 (1st Cir. 2014); *see also Phelps v. Optima Health, Inc.*, 251 F.3d 21, 28 (1st Cir. 2001).  An employee cannot demand an accommodation and then fail to provide the employer with information critical to determining whether the accommodation is necessary and reasonable. *Willingham v Town of Stonington*, 847 F. Supp. 2d 164, 188 (D. Me. 2012).  An employee's failure to participate in good faith precludes liability under the ADA.  *Kohl's*, 774 F.3d at 132.

Here, Remillard initially requested several accommodations, which were granted.  Only when Remillard suffered two allergic reactions in a two-week period that sent her to the ED, one to a substance that did not seem to contain bleach, did Defendants request further medical documentation to determine the severity of her allergy.  SUMF ¶¶ 34-41.  Then, following another serious reaction on July 16, 2018, Defendants requested further information.  SUMF ¶¶ 44-49, 54-56.  Defendants' request was reasonable, job-related, and consistent with business

necessity. *Sanders v. Ill Dep't of Cent. Mgmt. Servs.*, 2012 U.S. Dist. LEXIS 21317, at *17 (C.D. Ill. 2012) (it is lawful for employers to inquire into the ability to perform the essential functions of employees' job where the employer has a reasonable belief, based on objective evidence that: (a) an employee's ability to perform essential job functions will be impaired by a medical condition, or (b) an employee will pose a direct threat due to a medical condition).

EEOC enforcement guidance also provides that when the disability or the need for the accommodation is not known or obvious, it is job-related and consistent with business necessity for an employer to ask an employee for reasonable documentation about his/her disability and its functional limitations that require reasonable accommodation. *Wallace*, 2022 U.S. Dist. LEXIS 17158, at *21.

## 2. Defendants Did Not Place Remillard on a Leave or Terminate Her Due to Her Disability

Remillard cannot make out a *prima facie* case that she was placed on a leave or terminated as a result of her disability. First, Remillard cannot demonstrate that she is a qualified individual because the evidence establishes that she could not perform the essential functions of her position safely either with or without a reasonable accommodation. Despite numerous accommodations accorded Remillard over a lengthy period of time, she continued to experience allergic reactions in the workplace, with increasing severity, which posed safety concerns for herself, her patients, and her co-workers. SUMF ¶¶ 48-49, 58-63, 100-102,

Even during the incidents that Remillard suffered a "mild" reaction, she was often left without a voice for two to three days, which required her to communicate with patients and other nurses in a whisper. This increased the potential for miscommunication and additional safety issues. SUMF ¶¶ 7, 77-78, 84. Speaking was an essential function of Remillard's position,

SUMF ¶ 6, which she was unable to perform during the incidents where exposure resulted in her losing her voice.

Even assuming, *arguendo*, that Remillard could establish a prima facie case, she is unable to show by a preponderance of the evidence that Defendants' proffered reason for the unpaid leave or termination were pretextual and that the actual reason was discriminatory. *Wallace*, 2022 U.S. Dist. LEXIS 17158, *29.

Remillard is unable to demonstrate that she was subjected to any adverse action based upon any disability. Rather, the record is clear that the decision to place Remillard on an unpaid leave and then terminate her employment over a year later, was based solely upon Defendant's concern for Remillard's safety. Indeed, the record is clear that Defendants perceived Remillard's reactions in July 2018 and October 2019 as life-threatening. SUMF ¶¶ 36, 41, 48-49, 61-65, 91-102. As in *Wallace*, deposition testimony from Ms. Goudreau, Ms. Fallon, Ms. Basta, and Ms. Bailey all suggest that they were genuinely worried about Remillard's safety. 2022 U.S. Dist. LEXIS 17158, *29. Following Remillard's October 2019 incident, the record supports that Defendants reasonably and responsibly determined that it could no longer accommodate Remillard to provide her with a safe workplace.

There is simply no evidence in the record of pretext or anything to refute Defendants' legitimate, non-discriminatory reason for not allowing Remillard to return to work and then terminate her – concerns about her safety. In *Rabuffo v. VCA, Inc.*, the court found summary judgment appropriate where the undisputed facts showed that the employer was "genuinely concerned" about employee's allergy, and that was the reason why employer refused to permit the employe to return to work. 222 F. Supp. 3d 406, 24-25 (E.D. Pa. 2016). The court in *Rabuffo* also noted that the employer "repeatedly and clearly" communicated its concerns about

employee's allergy and "discussed these same concerns internally." *Id.* at 25. As in *Rabuffo*, the record is replete with examples of Defendants' concern about Remillard's safety and internal discussions about the issue. SUMF ¶¶ 36, 41, 48-49, 61-65, 91-102.

The fact that Remillard was employed for over a year and a half following her request for accommodations in January 2018 undermines any suggestion that Remillard was terminated due to her disability. Rather, the timeline and record underscore that Defendants wanted to work with Remillard to provide accommodations that allowed her to continue working safely. The record is clear that Remillard was a good nurse and, in fact, received a positive evaluation right before the October 2019 incident. SUMF ¶¶ 4-5. If Defendants wanted to terminate Remillard for having a disability and seeking accommodations, it would be nonsensical to wait until November 1, 2019 to do so.

## V.     Remillard's Retaliation Claim is Without Merit

Remillard's claim of retaliation is based on her allegation that Defendants attempted to force her to abandon her employment by suspending her, without pay, for two and one-half months after her allergic reaction on July 16, 2018. Comp. ¶ 89-91. To establish a claim for retaliation, Remillard must show that there is a causal connection between her protected conduct and an adverse employment action. *Kelley v. Correctional Medical Services, Inc.*, 707 F.3d 108, 115 (1st Cir. 2013); *see Soileau v. Guilford of Me.*, 105 F.3d 12, 17 (1st Cir. 1997) (termination after requesting an accommodation, does not, by itself, provide evidence of a causal connection).

First, Remillard's period off work between July 16, 2018 and October 2, 2018 does not even qualify as an adverse employment action. It was not a true suspension; rather, the sole reason for Remillard experiencing time away from work was her refusal to provide Defendants with requested medical information to evaluate her ability to safely return to work. SUMF ¶¶ 41, 61-62, 66-67.

Second, Remillard's claim of retaliation fails because there is no causal connection between any protected conduct and Remillard's period off work (if found to be an adverse action) or ultimate termination. Remillard requested and was repeatedly granted numerous accommodations to alleviate her issues with chemical sensitivities. It was only after Remillard had three visits to the ED in over a month, with one prompted by a substance to which Remillard did not have a known allergy, that Defendants sought additional information from her provider. SUMF ¶¶ 41-49, 54-56, 61-62. As discussed above with respect to disability discrimination, the timing of Remillard's leave of absence and ultimate termination do not make sense if they were done in retaliation for her seeking an accommodation.

Even if this Court found that Remillard was terminated in response to requesting an accommodation, Defendants had a legitimate, non-retaliatory reason for her termination: namely, concerns about Remillard's safety. To prevail on her retaliation claim, Remillard would need to show that Defendants' reason for Remillard's unpaid leave and ultimate termination was a pretext for retaliation. This is a burden that Remillard cannot carry.

As the court observed in *Wallace*: "Wallace also has not pointed to any evidence that suggests that NHBB harbored any retaliatory animus based on her requests for accommodation. Indeed, the evidence is to the contrary: NHBB readily granted several of her initial accommodation requests before asking for additional medical information . . . ." 2022 U.S. Dist. LEXIS 17158, 33.

Here too, there is no evidence in the record of any retaliatory animus based on Remillard's accommodation requests. Rather, the record is clear that Defendants sought to implement Remillard's reasonable requests. *See Duryea v. MetroCast Cablevision of N.H., LLC,* 2017 U.S. Dist. LEXIS 60841, *31 (D.N.H. Apr. 21, 2017) ("'Evidence that employer willingly

granted an employee's request for an accommodation, though no means dispositive of the matter, tends to militate against making an inference of retaliation.'") (citation omitted).  There is no dispute in the record that the reason for Remillard's time off from work, and ultimately her termination, was solely because of the severity of her allergic reactions and the concern to keep Remillard safe at work.  Defendants take their responsibility to provide a safe work environment seriously and it could not allow Remillard to potentially endanger her health, and the welfare of her coworkers and patients, even if Remillard wanted to continue to do so.

For the same reasons discussed above with respect to why the disability discrimination claim fails, the retaliation claim must also fail.  Based on the record, no reasonable jury could conclude that Remillard was terminated because she requested an accommodation.

## VI.     CONCLUSION

No dispute of material facts exists, and the Defendants are entitled to judgment as a matter of law as to all counts pending before the Court.

<div style="margin-left: 40%;">

Respectfully Submitted,
SOUTHERN NEW HAMPSHIRE
HEALTH SYSTEM, INC. and FOUNDATION
MEDICAL PARTNERS, INC,

By their attorneys,
JACKSON LEWIS P.C.,

</div>

Date:  September 18, 2023          By:     */s/ Kimberly Sullivan*
                                                K. Joshua Scott, NH Bar #17479
                                                Kimberly M. R. Sullivan, NH Bar #266861
                                                100 International Drive, Suite 363
                                                Portsmouth, NH 03801
                                                Tel. (603) 559-2700
                                                Joshua.scott@Jacksonlewis.com
                                                Kimberly.Sullivan@jacksonlewis.com

<u>Certificate of Service</u>

I hereby certify that the foregoing was filed with the Court using the Court's ECF filing system and that a copy was served on all counsel of record via the Court's ECF filing system.

Dated: September 18, 2023

*/s/* Kimberly Sullivan
Kimberly Sullivan

4878-2082-3419, v. 3