UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

MONIQUE REMILLARD,

    Plaintiff,

v.                                                        Civil Case No. 1:20-cv-1141-SE-TEM

SOUTHERN NEW HAMPSHIRE
HEALTH SYSTEM, INC. and
FOUNDATION MEDICAL
PARTNERS, INC.

    Defendants.

## **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

### I.    PRELIMINARY STATEMENT

Plaintiff Monique Remillard ("Plaintiff") submits this memorandum of law in support of her motion for summary judgment. Summary judgment must be entered in Plaintiff's favor (1) dismissing defendants Southern New Hampshire Health System, Inc.'s ("SNHHS") and Foundation Medical Partners, Inc.'s ("Foundation, and with "SNHHS", "Defendants") affirmative defense that her disability posed a "direct threat" because no reasonable jury could find that Defendants' decisions were based on the required individualized assessment of Plaintiff's ability to perform her job, and (2) imposing liability on Defendants for discrimination under federal and state disability discrimination law because, *inter alia*, Defendants' employees concede that the complained of actions were taken because of Plaintiff's disability and a desire to avoid even the remote chance of future events. Defendants failed to implement or fully implement reasonable accommodations and then claimed efforts to accommodate Plaintiff were futile, terminated her employment and banned her from every job within

the entire organization – a corporate behemoth that employs more than 7,500 employees in New Hampshire and Northern Massachusetts.[1] Whether motivated by fear of liability, a desire to avoid worker's comp claims, or even a paternalistic desire to protect Plaintiff, Defendants' decisions were unlawful.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff's Employment, Disability, and Record of Performance

1. Plaintiff, a Registered Nurse ("RN") was hired in September 2017 to work in the Hematology/Oncology practice of Foundation. As a condition of employment, Plaintiff was required to complete a Pre-Employment Physical Exam where she disclosed that she was severely allergic to perfumes, bleach, and chlorahexadine. Pre-Employment Physical Exam, attached as Ex. 1.

2. Plaintiff further disclosed in the pre-employment process that she had a prior worker's compensation claim due to exposure to "heavily scented odors" and her "[c]hemical sensitivity" which resulted in "trouble breathing, wheezing, gasping, flushing, chest tightness", and that her previous employer had been accommodating her by providing an air purifier near her desk. *Id.*

3. Anne Goudreau was the Clinical Nurse Manager of the Hematology/Oncology Practice and Plaintiff's direct supervisor. Plaintiff also informed Goudreau of her allergy early in her employment. Deposition of Anne Goudreau, attached as Ex. 2 ("Goudreau Tr.") at 10:7-14:8.

4. The essential job functions of Plaintiff's position included: using the Nursing Process, best practice standards, and evidence-based guidelines, to practice in

---

[1] SNHHS, along with Elliot Health System, is part of Solution Health. *See* http://www.solutionhealth.org/wp-content/uploads/2019/05/SolutioNHealth-One-Sheet-May-1.pdf.

collaboration with Providers to identify patient needs and implement an appropriate plan of care; obtaining health history and performing nursing assessments and interventions for patients; evaluating the needs of patients and collaborates with other team members; performing pre-visit planning; providing education for the patient, family, and/or caregiver. Job Description, attached as <u>Ex. 3</u> at p. 2.

5. The Job Description indicates that Plaintiff's position requires the use of effective <u>written</u> communication but is silent on any requirements for verbal communication. *Id.* at p. 3.

6. Defendants considered Plaintiff to be an "excellent nurse" and a wonderful person. Goudreau Tr. at 61:5-8. She practiced precisely and safely. Plaintiff was always very thorough and efficient at getting work done and would always ask others if they needed help if she finished her work. *Id.* at 19:6-17.

7. In 2019, Plaintiff's Annual Performance Appraisal indicated she was a "Strong Contributor" who "[c]ompletes her assignment within her scheduled work hours and does so skillfully, compassionately and with precision." 2019 Annual Performance Appraisal is attached as <u>Ex. 4</u>, p.3.

8. The 2019 Appraisal also noted that Plaintiff "[p]rovides thorough and pertinent patient education, ensuring patient/caregiver understanding….charting is impeccable and she rarely needs correction on her billing entry." *Id.* at p.2.

9. The 2019 Appraisal was created by Goudreau on September 27, 2019 and she signed it on October 3, 2019. *Id.* at p.5. The 2019 Appraisal did not indicate that Plaintiff was unable to meet any of the essential functions or requirements of her position. *Id.* Instead, Goudreau indicated that it was a pleasure to work with Plaintiff

and she was looking "forward to an exciting year ahead." *Id*. at p. 3.

Plaintiff's Disability and Defendant's Failure to Provide Reasonable Accommodations

10. Despite Plaintiff's disclosure pre-employment of her disability including her allergy to bleach which she was exposed during orientation, Defendants took no steps toward accommodation until late January 2018 when Plaintiff met with Pamela Fallon, an APRN in Employee Health Services. Employee Health Services Nurse Visit Note for Environmental Allergies, attached as Ex. 5.

11. During that visit Plaintiff suggested that her disability could be accommodated by:

> (1) Changing the air freshener in the bathroom to a non-aerosolized fragrance free deodorizer.
> (2) Posting "Fragrance Free" signs in the unit waiting room and patient areas.
> (3) Removing scented decorations in the lab.
> (4) Identifying who spoke to families/patients who wear scents.
> (5) Eliminating her exposure to bleach. *Id*. at p. 3.

12. Fallon presented the requested accommodations to Plaintiff's manager, Goudreau, who indicated that she would be able to accommodate them. Phone Note dated January 25, 2018, attached as Ex. 6.

13. Fallon agreed with Plaintiff that the hematology/oncology unit should be fragrance free and that signs should be posted in the waiting room and patient area reminding patients that the unit is fragrance free. In addition, either Goudreau or the charge nurse would speak to patients and family members wearing strong scents. January 25, 2018 email from Fallon to Plaintiff attached as Ex. 7; Deposition of Pamela Fallon ("Fallon Tr."), attached at Ex. 8, at 19:15-20:8.

4

14. Despite the recommendation from Employee Health that the unit be "fragrance free", Defendants refuse to implement this accommodation. Deposition of Joan Basta ("Basta Tr."), attached at <u>Ex. 9</u>, 99:19-100:11; Deposition of Donna Bailey ("Bailey Tr.") is attached at <u>Ex. 10</u>, at 66:17-67:10; Goudreau Tr. at 56:14-16.

15. Instead, Defendants continue to adhere to their current policy contained in the Health System Dress Code which under "General Requirements" indicates that "[s]cents and body odor, including excessive cologne, perfume, or smoke, are not acceptable in the workplace." On January 26, 2018, Defendants reminded Plaintiff' co-workers of the policy via electronic mail. January 26, 2018 email "Dress Code Policy Reminder" attached as <u>Ex. 11</u>. This would be the only written reminder Defendants would ever send to employees. Goudreau Tr. at 58:8-22 ("I believe that we also sent out an email to staff as well to make people aware and then we, you know, moved on."); Bailey Tr. at 94:18-22; Answer to Complaint at ¶ 31.

16. Defendants knew that the Dress Code Policy was subjective and did not prohibit scents. Bailey Tr. at 83:3-22.

17. Although Fallon in Employee Health recommended posting signs to "notify" and "encourage people not to wear fragrances", Defendants refused to implement this reasonable accommodation. Fallon Tr. at 19:15-20:8; Goudreau Tr. at 54:2-12.

18. The removal of bleach products and their non-use while Plaintiff was working was among the reasonable accommodations that Defendants' claimed to have implemented to accommodate Plaintiff's disability. Electronic mail message and Accommodations Implemented for Monique Remillard 7/31/18, updated 9/26/18,

5

attached as Ex. 12. All products containing bleach were to be clearly labeled with a red "Stop do not use near Monique" label, staff would refrain from using bleach wipes routinely and when necessary to use bleach containing cleaner, Plaintiff would be notified and directed to leave. *Id.*

19. Despite this accommodation around bleach, Plaintiff has had multiple exposures to bleach at work. On May 2, 2018, an exposure to bleach required treatment in the emergency department. Employee Health Services Phone Note re: May 2, 2018 occurrence attached as Ex. 13. Plaintiff was absent from work one day because of this exposure. *Id.*

20. On May 25, 2018, Plaintiff reacted to a cleaning product being used in the pharmacy area, which caused her to have difficulty breathing, speaking and swallowing, and seek treatment in the emergency department. Employee Health Services Nurse Visit attached at Ex. 14. For the first time, Defendants provided Plaintiff with an ADA certification form to bring to her provider, purportedly to determine what accommodations would keep Plaintiff safe. *Id.*

21. Plaintiff began to grow concerned about losing her job. *Id.* Basta resent the ADA Certification via electronic mail with a message that said "Our concerns are mainly, will repeated exposures from chemicals in the workplace cause your symptoms to worsen each time and does it rise to the level of life threatening?...We are truly looking out for your best interest and we need to know if we can provide a safe environment for you." Email from Joan Basta attached as Ex. 15.

22. Plaintiff returned the completed ADA certification form dated June 18, 2018, but did not request any new accommodations. The ADA form indicates that

6

Plaintiff is impaired in the major life activities of speaking and breathing. ADA Certification Form is attached as Ex. 16.

Defendants Demand Plaintiff Provide Justification for Her Termination and Unlawfully Suspend Her Employment

23. On June 26, 2018, Basta responded to Plaintiff saying the ADA Certification form was insufficient and Defendants "need the answer to a very important question. In your provider's opinion is your chemical sensitivity considered 'life threatening'." Basta continued: "This is a very important piece to know in order to determine if we can continue to accommodate." (emphasis added) Email from Basta to Plaintiff attached as Ex. 17.

24. On July 16, 2018, Plaintiff was exposed to bleach at work when Defendants' failed to label a bottle of cleaner on her unit in accordance with the purported reasonable accommodations. Plaintiff was treated in the emergency department and her manager expressed concern "about the ability to provide a work environment free of hazards that trigger reactions". Email summarizing the July 16, 2018 occurrence is attached as Ex. 18.

25. Plaintiff met with Basta in Employee Health on July 18, 2018 and Basta documented that "employee found to have no lasting effects from chemical exposure". Return to Work Consult Note attached as Ex. 19 Despite her medical fitness, Defendants refused to permit Plaintiff to return to work, instead demanding her medical provider answer two specific questions which they detailed on a Medical Evaluation form:
- What is the specific ingredient in bleach that triggers these episodes?
- Is this condition life threatening?

*Id.*; Referral for Medical Evaluation of Information attached as Ex. 20.

26. The Medical Evaluation form also demanded, as a condition of Plaintiff's return to work, "a letter on official letterhead outlining [Plaintiff's] diagnosis, prognosis, treatment, follow up plans…" *Id.*

27. Goudreau testified that the answer to the "life threatening" question would have made no difference in the practice because they "would have managed [Plaintiff's condition] the same way whether it was life threatening or not." Goudreau Tr. at 81:9-15.

28. Defendants demanded Plaintiff identify the specific ingredient in bleach triggering Plaintiff's reactions even though they had learned from their own General Manager of Environmental Services that it was "absolutely" effective to use non-bleach products in a healthcare environment and that the industry was heading in that direction. Email "cleaning solution question" is attached at Ex. 21.

29. Basta could not recall the origin or purpose behind the idea to demand Plaintiff isolate and identify the specific ingredient in bleach that was triggering her reactions and this idea had not originated with Employee Health (legal counsel was the only other person she identified discussing the matter with). Basta Tr. at 73:21-75:8. Once again, Goudreau could think of no legitimate job-related need for this ingredient information and did not think that knowing it would have changed the way they managed Plaintiff's allergies. Goudreau Tr. at 80:17-81:8.

30. On July 26, 2018, Counsel for Plaintiff wrote to Defendants about these unlawful inquiries under the ADAA and demanded that Plaintiff be permitted to return to work consistent with the return to work medical authorization Plaintiff had provided to them. Counsel also suggested accommodations, but was clear that "[Plaintiff] is not

8

demanding that you do any certain thing, nor is she under an obligation to suggest the appropriate accommodation." The accommodations suggested included issuing a policy regarding fragrances and chemicals in the workplace, providing notices of best practices surrounding chemical use in the work-place, providing training to employees regarding the proper use of chemicals, ensuring that all chemicals are properly labeled to avoid inadvertent use, and warning the affected employee prior to the use of certain chemicals or when there is someone present with a strong fragrance. Letter to Defendants from Counsel, attached as Ex. 22.

31. Counsel for Plaintiff wrote again on August 16, 2018, this time to outside counsel, with suggestions for reasonable accommodations including a non-subjective policy regarding fragrances and providing training to employees. Counsel also noted that should Plaintiff occasionally experience an occurrence due to failed accommodations, a brief leave of a day or two would also be a reasonable accommodation. Letter to Counsel for Defendants is attached as Ex. 23.

32. Defendants never requested Plaintiff obtain an independent medical evaluation. Basta Tr. at 55:6-10.

33. Plaintiff, at her own expense, sought an evaluation from Dr. Robert A. Timmons, Department Chair for Occupational & Environmental Medicine at Dartmouth Hitchcock. Dr. Timmons evaluated Plaintiff for her sensitivity to chemicals and recommended that she be accommodated by (1) not being exposed to bleach and bleach products which could be accomplished by using non-bleach alternative cleaning products; (2) promotion a fragrance free workplace in her area; and (3) training staff to ensure that cleaning products were properly mixed utilizing proper ratios. Notably, Dr.

Timmons did <u>not</u> suggest that it was unsafe for Plaintiff to work in her current position. Dr. Timmons Letter is attached as <u>Ex. 24</u>.

34. Basta agrees that Dr. Timmons has expertise in chemicals and did not disagree with the recommendations he made for reasonable accommodation of Plaintiff's disability. Basta Tr. at 113:19-114:21.

35. Defendants did not let Plaintiff return to work until October 2, 2018. Plaintiff did not demand, and the parties agreed Defendants could not provide, a guarantee that Plaintiff would not ever be exposed to a triggering chemical while at work. Defendants' Answers and Responses to Plaintiff's First Set of Interrogatories attached as <u>Ex. 25</u> at No. 6; Email Monique Remillard Update is attached as <u>Ex. 26</u>.

<u>Defendants Seize the First Opportunity to Fire Plaintiff and Ban Her From All Future Employment</u>

36. Plaintiff returned to work on October 2, 2018 and worked for more than one year without a significant incident or an incident requiring emergency intervention, during which time she received a performance appraisal where no concerns were expressed regarding her ability to perform the essential functions of her position and where she was deemed a "strong contributor". Goudreau Tr. at 107:3-11; <u>Ex. 4</u>.

37. On October 15, 2019, Plaintiff's co-worker sprayed perfume directly into the air to mask the body odor of a patient, instead of using one of the approved deodorizers. Basta Tr. at 107:22-108:3; Email "Monique Remillard Workplace Incident" is attached at <u>Ex. 27</u>, at DEF000276-277.

38. Because Plaintiff walked into the area right after the perfume was sprayed, she experienced an extremely severe reaction that required the assistance of a doctor working in the clinic and other nursing personnel before Plaintiff was

transported via ambulance to Defendants' emergency department. *Id*.

39. Although Plaintiff had not experienced any recent incidents, coworkers expressed concerns about the severity of the incident and about liability for treating Plaintiff. *Id*.

40. Defendants discussed revisiting the request to post signs regarding the use of fragrances, but did not post any. *Id.*

41. Plaintiff met with Basta and Fallon of Employee Health on October 17, 2019 and was advised that she was again suspended from work pending Defendants' decision about whether they would permit her to return, as a result of an incident where the reasonable accommodations were not adhered to. Email "Monique Remillard Update" is attached at Ex. 28; Goudreau Tr. at 102:2-20; Basta Tr. at 106:9-107:7.

42. Basta made it clear that the decision to suspend Plaintiff a second time was "solely about her health and safety." Ex. 28.

43. On October 25, 2019, Plaintiff contacted Basta and Goudreau, following up on her request to return to work after she noticed her schedule indicated she would be "off" for two additional weeks. Email "Return to work", attached as Ex. 29.

44. Plaintiff suggested that one incident of exposure directly caused by an absent-minded employee after one year without needing emergency medical treatment was evidence that the accommodations were working effectively and employee reeducation was the appropriate solution. *Id.*

45. Plaintiff's suggestion that employee's needed refresher training was ignored because Defendants had already decided to fire her. *Id.* ("Not sure how to respond or if I even should. How close are you to contacting her?") Bailey noted that

11

Defendants' "decision" was being based on "the severity of her latest reaction" and "our ability to provide a safe work environment". *Id.*

46. Basta, the person identified by Defendants as "involved in the decision to terminate Plaintiff's employment" who possessed the most medical experience, testified that her involvement was limited to "expressing concern about being able to keep Monique safe in the work environment." Basta Tr. at 115:13-116:13; Ex. 24 at No. 13. Bailey testified that the "ultimate decision maker" was Joan Basta in Employee Health. Bailey Tr. at 16:8-11.

47. Basta did not consult any medical records in evaluating the decision of Plaintiff's continued employment. Basta Tr. at 117:1-8.

48. Basta "believes" she spoke with Dr. Chun, the provider who assisted Plaintiff the day of the October 2019 incident, but the major concern in that conversation was Plaintiff's airway in that particular incident. Basta does not know if she reviewed any of the accommodations in place, or if she discussed with anyone whether there might be other accommodations that could prevent future incidents. Basta Tr. at 110:20-112:11.

49. Basta also did not consider that Plaintiff had worked for more than one year without a significant incident and could not identify any length of time between incidents that would have allowed her to be comfortable with Plaintiff's continued employment. Basta Tr. at 117:14-118:4.

50. Plaintiff was advised of her termination on October 31, 2019. When Plaintiff raised employee reeducation Defendants "quickly turned conversation to the fact that this was about severity of last incident and her health/safety, and that we

cannot offer an absolute guarantee re triggers in the work environments, as the basis for the decision we were separating her from employment." Email "Monique Remillard Follow Up", attached as Ex. 30.

51. Defendants refused to consider transferring Plaintiff to another opportunity within the organization because they "could not guarantee a safe working environment for her". Email "FW: [External] Monique Remillard – Registered Nurse (RN)/LPN – Reviewing" is attached as Ex. 31.

52. When Plaintiff applied for a position at a practice affiliated with Foundation, Bailey took steps to block her from consideration. Bailey Tr. at 118:7-120:4.

## III. ARGUMENT

### A. Defendants Cannot Satisfy the Requirements of the Direct Threat Affirmative Defense Because the Undisputed Evidence Establishes That the Decision to Terminate Plaintiff Was Not Based on an Individualized Assessment, Nor the Most Current Medical Knowledge/Best Available Objective Evidence.

In enacting the Americans with Disabilities Act, Congress explicitly warned against "overprotective rules and policies, failure to make modifications to existing facilities and practices" that act as discriminatory barriers to people with disabilities. 42 U.S.C. § 12101(a)(5). It is precisely these paternalistic practices that are at issue in this case, where the type of employer most equipped to manage Plaintiff's condition should she be inadvertently exposed has terminated her employment because they cannot guarantee an exposure-free workplace and therefore, her complete safety, a guarantee she has never sought and cannot find in any place of employment.

In terminating Plaintiff, Defendants ignored all medical evidence and relied only on their own irrational fears. Such decision-making is unlawful. "Direct threat" is defined as "a significant risk of substantial harm to the health or safety of the

individual or others." 29 C.F.R. § 1630.2(r). The Supreme Court has recognized that avoiding stereotypical assumptions requires a careful and "individualized" review of the facts. "Such an inquiry is essential if [the law against disability discrimination] is to achieve its goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear …." School Bd. of Nassau County, Fla. v. Arline, 480 U.S. 273, 287 (1987) (interpreting ADA's precursor, § 504 of the Rehabilitation Act of 1973). Thus:

> [t]he determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:
>
> (1) The duration of the risk;
>
> (2) The nature and severity of the potential harm;
>
> (3) The likelihood that the potential harm will occur; and
>
> (4) The imminence of the potential harm.

29 C.F.R. § 1630.2(r)[2].

Because "direct threat" is an affirmative defense, Defendants will bear the burden at trial. *See* Nunes v. Wal-Mart Stores, Inc., 164 F.3d 1243, 1247 (9th Cir. 1999). *See also* Rose v. Laskey, 2004 U.S. App. LEXIS 20506 at *3-4 (1st Cir. 1197) (noting the distinction between cases where defendants put forth direct threat as an affirmative

---

[2] Although Defendants, through counsel, have made mention of a hypothetical safety risk to patients on occasion, Plaintiff's disability has never actually been associated with one. Her performance assessment, signed by her manager twelve (12) days before the last exposure for which her employment was terminated, makes no mention of any patient care issues and only praises Plaintiff patient care and patient education. *See* Ex. 4.

14

defense versus those where the burden is on the employee to establish they are not a safety threat).

The undisputed facts are that Defendants did not conduct an individualized assessment. This is fatal to the direct threat affirmative defense; individualized assessments are essential to protect against the risk of paternalism the ADA was enacted to discourage. *See* Chevron U.S.A., Inc. v. Echazabel, 536 U.S. 73, 85-86 (2002). First, Defendants have stated repeatedly that they were only concerned with the severity of the last incident on October 15, 2019. Defendants do not rely on any medical expertise and reject the medical expertise that was available to them such as the recommendations of Dr. Timmons and Plaintiff's primary caregiver on the ADA Certification Form (Ex. 16), neither of which expressed any hesitation with Plaintiff working. At times, Defendants ignore themselves, such as when Basta notes that Plaintiff was "found to have no lasting effects from chemical exposure" in July 2019, yet Defendants continue to keep her out of work, unpaid, until October 2, 2019. (Ex. 19)

Second, Defendant's rely solely on one incident, which resulted from an extreme deviation from policy – the spraying of fragrance directly into the air – to argue severity. There is no question that Plaintiff's immediate reaction was severe, but she also recovered and was cleared by medical professionals to return to work. Furthermore, the evidence demonstrates that Defendants concluded, without objective evidence, that the increase in severity was due to Plaintiff's worsening condition and not to the particular circumstances of someone using perfume as an air freshener. Defendants did not examine Plaintiff or even review her medical records after the incident in reaching the conclusion that it was not safe for her to return to work.

*Compare* Hutton v. Elf Atochem N. Am., Inc., 273 F. 3d 884, 887-891 (9th Cir. 2001) (direct threat assessment was based on reports and advice from six doctors who conducted numerous examinations of the plaintiff). Despite many exposures at work and in life, Plaintiff has never experienced a permanent injury and has never missed more than a day or two of work as the result of an exposure. No medical professional has suggested that Plaintiff be disqualified from all categories of jobs and live a completely isolated life to avoid potential exposures.

The third element that must be considered, the likelihood that the potential harm will occur, is one that remains largely within Defendants' control. Having failed to fully implement accommodations, educate employees, or make sincere attempts to prevent exposures before they happen, Defendants share responsibility. They should not be permitted to benefit from failing to meet their legal obligations by using Plaintiff's exposure as evidence that harm is likely, particularly where there is no evidence of lasting harm to Plaintiff. "Firing an employee does erase an employer's failure to accommodate during that employee's tenure." Hunter v. Texas Roadhouse, 2020 U.S. Dist. LEXIS 21676 at *22 (D. Idaho February 3, 2020).

Finally, the imminence of harm to Plaintiff is – and can remain – remote when reasonable accommodations are made and adhered to. Goudreau Tr. at 102 ("…adhering to the accommodations would have kept her out of harm's way in this instance, yes."). Defendants cannot fail to fully implement and enforce reasonable accommodations and then throw up their hands in defeat when they don't work as attended to allow Plaintiff to safely perform in her position.

Defendants analysis, as they said over and over again, focused exclusively on the severity of the last incident and their inability to guarantee Plaintiff's safety. The lone individual in a medical role involved in the decision has testified that her involvement was limited to "expressing concern about being able to keep [Plaintiff] safe". She did not review medical records or consider Plaintiff's employment history including the duration between incidents. Moreover, she could not identify any amount of time that would have allowed her to feel comfortable solely because of the perceived severity of the last incident.

Defendants' assessment is insufficient as a matter of law and judgment in Plaintiff's favor should enter on the direct threat affirmative defense.

### B. Because the Direct Threat Affirmative Defense is Unavailable Summary Judgment Should Enter on Liability.

Defendants have been forthright in their position that Plaintiff was terminated because of her disability, but for her own good, to keep her safe. Although they may legitimately believe they were acting to protect Plaintiff, this is exactly the type of discrimination the ADAAA was designed to protect against. Having failed to establish their entitlement to the direct threat affirmative defense, Defendants cannot avoid liability for terminating Plaintiff's employment and summary judgment on this point is proper.

**WHEREFORE**, Plaintiff respectfully request that this Court:

A. Grant Plaintiff's Motion and enter judgment dismissing Defendants' direct threat affirmative defense (c);

B. Grant Plaintiff's Motion and enter summary judgment as to liability as to Plaintiff's termination; and

C.      Grant such other and further relief as is just and equitable.

                                      MONIQUE REMILLARD
                                      By her attorneys,

                                      KBV LAW,

Date: September 18, 2023      By:   */s/ Kamee Verdrager*
                                                        Kamee Verdrager (NH Bar# 21266)
                                                        P.O. Box 90
                                                        W. Nottingham, NH 03291
                                                       603.488.1473
                                                       kbv@kbvlawpc.com

## CERTIFICATE OF SERVICE

I certify on this date, a copy of the foregoing pleading was served upon all counsel of record via the Court's CM/ECF system.

                                        /s/ *Kamee Verdrager*
                                        Kamee Verdrager