UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Monique Remillard

   v.            Civil No. 20-cv-1141-SE
                Opinion No. 2024 DNH 086
Southern New Hampshire Health System, Inc. and
Foundation Medical Partners, Inc.


ORDER

   Congress passed the Americans with Disabilities Act, in no small part, to protect disabled individuals from "overprotective rules and policies" that might discriminate against them in employment. 42 U.S.C. § 12101(a)(5). Thus, under the ADA, an employer may not engage in "workplace paternalism," and categorically conclude that an employee with a disability cannot perform her job safely. Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 86 (2002). But the ADA does not preclude an employer from making decisions based on legitimate safety concerns which arise out of documented workplace incidents, even when those safety concerns stem from an employee's disability.

   In this case, Monique Remillard, who is allergic to certain fragrances and chemicals, worked as a nurse for the defendants, Southern New Hampshire Health System, Inc. ("Southern") and Foundation Medical Partners, Inc. ("Foundation"), for approximately two years. During Remillard's employment, the defendants implemented several measures to accommodate her disability. Despite the defendants' efforts, Remillard had numerous allergic reactions to fragrances or chemicals during her employment, four of which sent her to the emergency room. After her fourth and most serious allergic reaction, which heightened several of the defendants' employees' existing concerns that Remillard's condition was life-threatening,

the defendants determined that they could not keep Remillard safe and terminated her employment. Remillard then brought this suit, alleging claims for disability discrimination and retaliation under the ADA and New Hampshire Revised Statute Annotated ("RSA") § 354-A. The parties have now filed cross-motions for summary judgment.

As explained below, the undisputed record evidence shows that the defendants were motivated solely by concerns for Remillard's safety—concerns which arose only after Remillard had several serious allergic reactions to fragrances and chemicals despite the defendants' efforts to accommodate her—when they made adverse employment decisions. As such, those employment decisions cannot be the basis for Remillard's disability discrimination or retaliation claims based on the facts of this case. However, because there is a factual dispute, albeit a thin one, over whether the defendants reasonably accommodated Remillard's disability, her discrimination claim based on an alleged failure to accommodate survives.

Standard of Review

The court treats cross-motions for summary judgment separately, drawing inferences in the nonmoving party's favor. AJC Int'l, Inc. v. Triple-S Propiedad, 790 F.3d 1, 3 (1st Cir. 2015). Granting summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "carries with it the potential to affect the outcome of the suit." French v. Merrill, 15 F.4th 116, 123 (1st Cir. 2021) (quotation omitted). A material fact is in genuine dispute if "a reasonable jury could resolve the point in the favor of the non-moving party." Id. In considering a motion for summary judgment, the court may review materials cited in the motion and other materials in the record. Fed. R. Civ. P. 56(c)(1)(3).

Background

Foundation is a multi-specialty provider group that operates an oncology and hematology practice in Nashua, New Hampshire, and is part of the Southern healthcare system. Remillard began her employment as a registered nurse at the Foundation oncology and hematology practice on September 11, 2017. Before starting at Foundation, she underwent a mandatory pre-employment physical examination during which she disclosed severe allergies to chlorhexidine, perfumes, and bleach. Remillard also reported that she always carries an EpiPen, Benadryl, and an albuterol inhaler.

Soon after Remillard started at Foundation, her supervisor, Anne Goudreau, the oncology and hematology clinical nurse manager, contacted Southern's employee health services department because Remillard was experiencing allergic reactions at work that caused her to lose her voice. Goudreau was also concerned that Remillard might be in violation of Foundation's attendance policy because she needed time off from work to recover. Goudreau, who was responsible for enforcing the policy, did not want to "unfairly penalize" Remillard. Doc. no. 30-4 at 12. As a result, Remillard met with an employee health nurse practitioner, Pamela Fallon, on January 25, 2018, to discuss her allergies. At that meeting, Remillard and Fallon discussed several accommodations that the oncology and hematology practice could adopt, including replacing a bathroom air freshener with a fragrance-free deodorizer, posting signs notifying patients that the practice is fragrance-free, removing scented decorations in the practice's lab, identifying the Foundation employees who would speak to patients or family members who wore scents to the practice in order to limit Remillard's contact with them, and eliminating her exposure to bleach.

On that same day, Fallon and Goudreau spoke about those accommodations. Ultimately, Foundation took numerous steps to accommodate Remillard's allergy, particularly to limit her exposure to cleaning products and scent-wearing individuals.[1] They did not post signs designating the practice as fragrance-free but did send an email to Remillard's coworkers notifying them that an unnamed member of the practice was "highly allergic to strong scents" and asking for "cooperation in making this a safe work environment for her." Doc. no. 29-1 at 3. The email also referred to Southern's dress code prohibiting excessive scents in the workplace. Id. at 4. Nevertheless, as described below, Remillard was exposed to bleach, perfume, and other triggering chemicals numerous times during the course of her employment.

On May 2, 2018, Remillard had an anaphylactic reaction to bleach at work. Although the cleaning staff using bleach had closed the area off from the rest of the oncology and hematology practice, the bleach fumes vented into the nursing station where Remillard was working and caused her to have a reaction. Remillard visited the emergency room after using Benadryl, her inhaler, and her EpiPen. She missed the next day of work. Approximately two weeks later, Remillard had another anaphylactic reaction at work, this time to a cleaning product called Stride SC Neutral Cleaner. Again, Remillard had difficulty breathing. She used an albuterol inhaler, EpiPen, and a nebulizer treatment. She ultimately visited the emergency room.

Remillard met with Joan Basta, Southern's director of employee health, on May 30, 2018, to discuss these two incidents and her allergy accommodations. At that meeting, Remillard told Basta that Foundation staff had been very supportive of her need for accommodations. Basta

---

[1] Doc. no. 29-32 contains a list of all of the accommodations that the defendants adopted as of September 26, 2018. Remillard and the defendants agreed at that time that the practice would not eliminate the use of bleach entirely because it is a component of the Center for Disease Control's protocol for cleaning areas potentially contaminated with *Clostridium difficile*. Doc. no. 29-39 at 1.

explained to Remillard that Goudreau was concerned about Remillard's safety at work and asked her to seek information from her medical provider about the nature of her allergy and reactions. Basta followed up with Remillard by email and attached Southern's "ADA Certification Form." Doc. no. 30-17. She asked Remillard to meet with her provider and have him or her fill out the certification form. She also asked Remillard to direct her provider to address two questions not listed on the form: "[W]ill repeated exposures [to] chemicals in the workplace cause your symptoms to worsen each time and does [your allergy] rise to the level of being considered life threatening?" Id.

Remillard returned the completed certification form to Basta on June 18, 2018. It recommended "[n]o bleach or other designated chemicals to be used in the employee[']s presence" and "notifying the employee of any persons wearing perfumes/colognes." Doc. no. 30-18 at 2. These accommodations were already in place following Remillard's January 25, 2018 meeting with employee health, and she "did not request any new accommodations." Doc. no. 30-1 at 6. On June 26, 2018, Basta replied to Remillard that the defendants still needed to know whether her allergy was "life threatening . . . in order to determine if we can continue to accommodate." Doc. no. 30-19. Remillard did not respond.

Remillard was exposed to bleach again on July 16, 2018. Despite using an inhaler, EpiPen, Benadryl, and a nebulizer, she continued to have difficulty breathing. Remillard's co-workers called 911, and she was transported to the emergency room in an ambulance. Although Foundation had instituted several measures to protect Remillard from bleach exposures, an employee mistakenly used an unmarked bottle of cleaner that contained bleach while in proximity to Remillard. After the incident, Foundation directed their janitorial services to ensure that all cleaning products were labeled. Nevertheless, Goudreau reiterated to employee health her

concern for Remillard's safety at work and that she felt that the severity of Remillard's reactions seemed to be increasing and were life-threatening.

Two days later, on July 18, 2018, Basta met again with Remillard to discuss her most recent allergic reaction. At that meeting, Basta informed Remillard that she would not be able to return to work until her provider answered the questions, "[w]hat is the specific ingredient in bleach that triggers these episodes?" and "is this condition life threatening?" Doc. no. 29-1 at 9. Basta also emailed Remillard a form entitled "Referral for Medical Evaluation or Information." Doc. no. 30-22. That form directed Remillard to acquire "a letter on office letterhead outlining [her provider's] diagnosis, prognosis, treatment, follow-up plans and any specific recommendations (if any)[,] restrictions[,] or accommodations at work." Id. The form also indicated that Remillard's provider should answer the specific questions that Basta posed to Remillard in their meeting. Finally, the form directed Remillard to respond by July 27, 2018.

Remillard's counsel notified the defendants on July 26, 2018, that she refused to answer the questions that Basta posed or provide any additional information and considered the requests to be prohibited by the ADA. Doc. no. 29-31. Instead, she "demand[ed] . . . that [the defendants] immediately allow [Remillard] to return to work and take steps to engage in the interactive process so that Ms. Remillard can safely perform the essential functions of her position." Id. at 6. The defendants did not immediately reinstate Remillard and continued to request that she obtain further information from her provider.

Remillard's attorney communicated with the defendants and their attorney several times from July through September 2018. Broadly speaking, Remillard's attorney continued to demand that the defendants reinstate Remillard immediately and refused to obtain any additional information from Remillard's medical providers. The defendants and their attorney maintained

their position that they could not reinstate Remillard without receiving further information from a medical provider that could allow them to evaluate whether they could continue to accommodate her.

Remillard ultimately provided a letter to the defendants, dated September 10, 2018, from a doctor of occupational and environmental medicine at Dartmouth-Hitchcock. It stated that the defendants could accommodate Remillard's allergy by using non-bleach cleaning products, promoting a fragrance-free workplace, and training staff on how to properly mix cleaning products. Doc. no. 30-26. Ten days later, several of the defendants' employees, including Basta and Goudreau, had a meeting to discuss the provider's letter and to walk through Remillard's work area to review the accommodations in place in preparation for Remillard's return to work. Doc. no. 29-1 at 9; doc. no. 29-34 at 1.

On September 26, 2018, the defendants' counsel wrote a letter to Remillard's counsel explaining that the defendants had reviewed the doctor's letter and were "willing to return Ms. Remillard to work effective October 1, 2018, as a nurse in the Hematology/Oncology Department." Doc. no. 29-37 at 1. The letter added that the defendants could not give assurances that Remillard would never be exposed to bleach or a bleach product, for various reasons, including the defendants' need to comply with CDC-recommended measures for "when a patient presents with C-diff." Id. The letter added that the defendants have "asked, and will continue to ask, patients to refrain from wearing fragrances, but the practice cannot require or absolutely control the actions of patients or guarantee that Ms. Remillard will not be exposed to a fragrance." Id. The letter then asked Remillard's counsel if Remillard would return to work under those conditions, given that the defendants "cannot guarantee her safety or that she will not at some point be exposed to an agent that may cause a reaction." Id. at 2.

7

Remillard responded through counsel via letter on September 27, 2018. The letter stated that "Ms. Remillard fully understands that [the defendants] cannot offer her a guarantee that she will not be exposed to a triggering chemical, nor does she expect it." Doc. no. 29-38 at 2.

Remillard returned to work on October 2, 2018. On October 24, Basta called Remillard to ask whether she was experiencing any issues with the accommodations in place following her return. Remillard told her that "everything is fine" and said that she did not feel she needed any other accommodations. Doc. no. 29-41. Remillard later testified in a deposition that, although she did not remember this conversation with Basta, at that time she was concerned for her job and "was afraid to say more" about the adequacy of the accommodations; in fact, she "recall[ed] thinking that more were needed." Doc. no. 29-5 at 32.

Remillard did not experience another severe reaction for approximately one year. Goudreau testified that "throughout the end of 2018 and then into 2019[,] I felt that things were going pretty smoothly, that we were able to accommodate [Remillard and keep] her out of harm's way." Doc. no. 29-11 at 25. On October 15, 2019, however, a lab employee sprayed perfume into the air to cover up a bad odor. Remillard suffered her most serious at-work allergic reaction to date. Remillard treated the reaction with Benadryl, an albuterol inhaler, an albuterol nebulizer, and two EpiPen doses (the nebulizer and second EpiPen were administered by other practice staff). None of those measures treated her acute symptoms. Ultimately, a doctor in the practice started an IV in an attempt to help Remillard breathe, and she was taken to the emergency room.

Later that day, Remillard texted with a colleague at the practice who helped to treat her. That colleague told Remillard "to reach out to [her] allergist" because "[i]t didn't seem like the [EpiPen] helped at all." Doc. no. 29-45 at 3. She added, "[i]t was a bad one today." Id. The

8

following day, she texted Remillard: "I am sorry [that you are still in pain,] but ur [sic] breathing." Id. at 2. Remillard replied: "I am breathing, so no matter what it's an improvement over yesterday." Id.

Fallon testified about Remillard's October 15, 2019 reaction that "Monique was so lucky to be where she was[,] and the fact that there was a medical doctor able to provide medical care in order to sustain her life. . . . For such an event to occur and to have such resources right there [. . . ] how lucky she is to be alive[,] is my feeling." Doc. no. 30-10 at 13. Goudreau testified that, following the incident, she was asked if she "felt that we could provide a safe environment [for Remillard] at that point[,] and I said 'no, we cannot.'" Doc. no. 30-4 at 26.

On October 17, 2019, Remillard met with Basta and Fallon in employee health. They "observed that Remillard looked very pale and not well at the [meeting]" and decided that she could not yet return to work. Doc. no. 29-1, ¶ 97. Remillard followed up with Basta and Goudreau by email on October 25 requesting that she be allowed to return to work and asserting that "the accommodations we had in place are working effectively" but that "some refresher education may be in order for other employees." Doc. no. 30-31 at 2. Remillard made this suggestion even though, according to Remillard's own deposition testimony, the Foundation employee who sprayed the perfume knew that she was supposed to use an approved deodorizer and that she should not have sprayed perfume.

Ultimately, Basta, Fallon, and Goudreau, as well as other of the defendants' employees, concluded that the defendants could not continue to employ Remillard in light of her serious allergic reactions at work. Basta testified that she was "very concerned that we couldn't keep [Remillard] safe in the work environment," and that "based on her four trips to the emergency room[,] I guess all I can say is[,] especially the last incident that was so serious[,] I was gravely

concerned for her health and safety." Doc. no. 30-11 at 30. Donna Bailey, a human resources employee, similarly testified that Remillard was terminated because of "safety in the workplace and what was deemed to be a life-threatening reaction in terms of the last incident." Doc. no. 30-12 at 27. The defendants terminated Remillard's employment on October 31, 2019. This action followed.

<u>Discussion</u>

Remillard's complaint asserts two counts, both of which arise under the ADA and RSA 354-A. Count I asserts a claim for disability discrimination, predicated on the defendants' failure to accommodate Remillard, her *de facto* suspension,[2] and her ultimate termination. Count II asserts a claim for disability retaliation based on the defendants' decisions to suspend Remillard and terminate her employment.

The defendants move for summary judgment on both counts. Doc. no. 29. Remillard moves for summary judgment on her claim for disability discrimination in Count I. Doc. no. 30. The court held a hearing on both motions, during which it granted the parties the opportunity to submit additional briefing. The parties have since filed their respective supplemental briefs, doc. nos. 46, 47, and the court has considered them in resolving the motions for summary judgment.

"As this court and the New Hampshire Supreme Court have recognized, claims under Section 354-A are construed in conformity with the ADA." Wallace v. N.H. Ball Bearings, Inc., No. 19-CV-1049-SM, 2022 WL 279676, at *5 n.8 (D.N.H. Jan. 31, 2022) (analyzing plaintiff's

---

[2] Remillard characterizes her unpaid absence from work from July 18, 2018, to October 2, 2018, as a "suspension." <u>See</u>, <u>e.g.</u>, doc. no. 31 at 24. Although the defendants dispute that they suspended Remillard, the court uses the term as a convenient shorthand that is understood by the parties to refer to that particular period.

RSA 354-A and ADA disability discrimination and retaliation claims together using federal standards established under the ADA). In addition, the parties cite only to federal case law regarding the ADA in their summary judgment briefing. Accordingly, the court relies on cases interpreting the ADA to assess Remillard's federal and state discrimination and retaliation claims.

I.       The Defendants' Summary Judgment Motion

         A. Count I – Disability Discrimination

The ADA proscribes discrimination "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). As mentioned above, Remillard's disability discrimination claim is based on two different types of discrimination. First, she alleges that the defendants' adverse employment actions against her—placing her on suspension and terminating her employment—were unlawfully motivated by her disability. Second, she alleges that the defendants did not reasonably accommodate her.

These two types of discrimination claims require different analytical frameworks. The first type, "requires that the plaintiff point to evidence, direct or circumstantial, of a particularized discriminatory animus." Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999). A failure to accommodate claim, however, "does not require that an employer's action be motivated by a discriminatory animus directed at the disability. Rather, any failure to provide reasonable accommodations for a disability is necessarily 'because of a disability'—the accommodations are only deemed reasonable (and, thus, required) if they are needed because of the disability—and no proof of a particularized discriminatory animus is

exigible." Id. Therefore, the court analyzes separately the different bases for Remillard's discrimination claim in Count I.

### 1.       Suspension and Termination

Disability discrimination cases based on adverse employment actions "fall into two general categories. The more common genre involves evidence of discrimination that is circumstantial." Patten v. Wal-Mart Stores E., Inc., 300 F.3d 21, 24 (1st Cir. 2002). Those cases are proven "using the *prima facie* case and burden shifting methods that originated in McDonnell Douglas [Corp. v. Green, 411 U.S. 792 (1973)]." Jacques v. Clean-Up Grp., Inc., 96 F.3d 506, 511 (1st Cir. 1996). Once a plaintiff establishes a *prima facie* case of discrimination, "the burden shifts to the employer to advance a legitimate, nondiscriminatory reason for its actions." Trahan v. Wayfair Maine, LLC, 957 F.3d 54, 60 (1st Cir. 2020). If the employer "proffer[s] a non-discriminatory reason for the adverse employment action, the employee—at the third stage of the analysis—must show that the employer acted not for the stated reason but, rather, because of the plaintiff's disability." Id. at 61.

The defendants, viewing this case as one involving circumstantial evidence, evaluate Remillard's claim in their motion using the McDonnell Douglas framework. Remillard, however, argues in her objection that this is the "second and less common type" of disability discrimination case that "involves direct evidence, evidence that unambiguously implicates a disability discrimination motive." Patten, 300 F.3d at 25. Therefore, before addressing the defendants' arguments in favor of summary judgment on Remillard's discrimination claim, the court must determine whether the case involves direct or circumstantial evidence of discrimination.

a.   Direct Evidence of Discrimination

Direct evidence of discrimination "unambiguously implicat[ing] a disability

discrimination motive" includes "statements by a decisionmaker that directly reflect the alleged

animus and bear squarely on the contested employment decision." Patten, 300 F.3d at 25.

(quotation omitted); see also Brookline Opportunities, LLC v. Town of Brookline, No. 21-CV-

770-PB, 2023 WL 4405659, at *11 n.11 (D.N.H. July 7, 2023) ("[The] traditional view of direct

evidence [is] 'evidence which, if believed, suffices to prove the fact of discriminatory animus

without inference, presumption, or resort to other evidence." (quotation omitted)).

Remillard argues that direct evidence of discrimination exists in this case because the

defendants admit "that the plaintiff's disability was the reason for the adverse action," doc. no.

31 at 18-19, and that "[the defendants'] motivation," which they assert was concerns for

Remillard's safety, "does not matter," doc. no. 34 at 9-10. But that is not the case. The relevant

consideration is not whether there is direct evidence that a plaintiff's disability factored into a

defendant's employment decision. See, e.g., Finley v. Huss, 102 F.4th 789, 823 (6th Cir. 2024)

(refuting the plaintiff's theory that "direct evidence of discrimination exists whenever a

defendant's stated reason for an adverse action is behavior that can be traced to the plaintiff's

disability"). Instead, a plaintiff must have "direct evidence of discriminatory animus." Flaherty v.

Entergy Nuclear Operations, Inc., 946 F.3d 41, 53 (1st Cir. 2019).

No such direct evidence exists in this case. Rather, as Remillard admits, the undisputed

record evidence shows that the defendants' actions towards her were motivated by concerns for

her safety that developed during her employment. Although Remillard contends that the

defendants should not have been as concerned as they were, an employer acting because of

legitimate safety concerns is not direct evidence of discriminatory animus. See Sensing v. Outback Steakhouse of Fla., LLC, 575 F.3d 145, 163 (1st Cir. 2009) (distinguishing in ADA context whether the defendant's decision to terminate the plaintiff was based on "legitimate safety concerns or alternatively, impermissible discriminatory animus"); Kendrick v. Me. Med. Ctr., 547 F. Supp. 3d 87, 109 (D. Me. 2021) (same); Carmichael v. Verso Paper, LLC, 679 F. Supp. 2d 109, 132 (D. Me. 2010) (same); see also Mitchell v. U.S. Postal Serv., 738 F. App'x 838, 845 (6th Cir. 2018) (Employer's decision to place employee on leave, and then ultimately to terminate him, was not direct evidence of discrimination, even though related to the employee's disability, because it was predicated on the employee's "ability to safely work, not because of [employee's] depression.").

Remillard relies heavily on Equal Emp. Opportunity Comm'n v. Dolgencorp, LLC, 899 F.3d 428 (6th Cir. 2018). See doc. no. 31 at 19; doc. no. 34 at 10. Specifically, she argues that Dolgencorp stands for the proposition that an employer may not in any way consider the effects of a plaintiff's disability when making employment decisions. But, as the Sixth Circuit later clarified, Dolgencorp is not as far reaching as Remillard claims. Rejecting an argument similar to Remillard's, the Sixth Circuit held that "Dolgencorp stands for a far narrower principle. It holds only that a defendant cannot unreasonably deny a plaintiff's requested accommodation to a generally applicable policy, and then use that neutral policy as a purportedly nondiscriminatory basis for taking an adverse action." Finley, 102 F.4th at 823. Thus, Dolgencorp's holding does not support Remillard's argument and her reliance on it is misplaced.

Because safety concerns stemming from an employee's disability are not evidence that unambiguously implicates a disability discrimination motive, the court will analyze Remillard's

suspension and termination claim under the framework for evaluating circumstantial evidence of discrimination.

### b.   Circumstantial Evidence of Discrimination

As discussed above, courts evaluate circumstantial-evidence ADA discrimination claims using the McDonnell Douglas three-step, burden-shifting framework. The court now proceeds with that analysis.

### i.   *Prima Facie* Case

To establish a *prima facie* case of discrimination, a plaintiff must show "(1) that she was 'disabled' within the meaning of the ADA; (2) that she was able to perform the essential functions of her job with or without accommodation [(i.e., that she was a 'qualified individual' under 42 U.S.C. § 12111(8))]; and (3) that she was discharged or adversely affected, in whole or in part, because of her disability (i.e., suffered an adverse employment action)." López-López v. Robinson Sch., 958 F.3d 96, 104 (1st Cir. 2020). "The burden of making out a *prima facie* case is not onerous." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991) (quotation omitted).

The defendants do not dispute that Remillard is disabled under the ADA. As to whether she is a "qualified individual," 42 U.S.C. § 12111(8), the defendants' motion argues, in one brief paragraph, that Remillard's allergic reactions sometimes affected her ability to perform an essential function of her job—speaking to patients. See doc. no. 29-1 at 21-22. Remillard argues that she performed all of the essential functions of her job and that the reasonable

accommodations in place during her employment allowed her to do so. She further points to her uniformly positive performance reviews as undisputed evidence of her qualifications.

The defendants' specific argument is that Remillard occasionally had difficulty speaking above a whisper when she was experiencing a reaction. They argue that this difficulty rendered her unqualified because it created "potential for miscommunication and safety issues." Id. at 21. "[Courts] generally give substantial weight to the employer's view of job requirements." Ward v. Mass. Health Rsch. Inst., Inc., 209 F.3d 29, 34 (1st Cir. 2000). However, the defendants have not pointed to evidence of actual safety issues (i.e., an inability to perform an essential function of her job) that manifested when Remillard lost her voice. Instead, the evidence suggests that Foundation successfully accommodated Remillard's occasional difficulty speaking above a whisper. The defendants' arguments appear to be limited to *potential* safety risks. At best, the defendants have created a weak dispute of fact on this issue, which is insufficient to undermine Remillard's *prima facie* case at this stage.

For the third element of the *prima facie* case, Remillard must show that she was subjected to an adverse employment action due to her disability. Remillard argues that the defendants suspended and then fired her because of considerations relating to her disability, and not, for example, her job performance. In light of Remillard's minimal burden, the court finds that she has established a *prima facie* case of discrimination. Thus, the burden shifts to the defendants to proffer a legitimate, non-discriminatory reason for suspending and firing Remillard. See Fennel, 83 F.3d at 535.

ii.        <u>Legitimate, Non-Discriminatory Reason</u>

The defendants assert that their actions towards Remillard, including suspending and firing her, were motivated by concerns for her safety, and thus were based on a legitimate and non-discriminatory reason. Remillard argues that the defendants' safety concerns are not a legitimate and non-discriminatory reason. She contends, instead, that the defendants may assert those concerns only in the context of the ADA's "direct threat" affirmative defense and not in the context of the <u>McDonnell Douglas</u> framework. The defendants counter that the existence of the safety-related direct threat defense does not preclude them from arguing that their safety concerns regarding Remillard were a legitimate, non-discriminatory justification for their actions towards her.

Under the direct threat defense, an employer may escape liability under the ADA if it can prove that an employee is not qualified for her job because she poses an unacceptable safety risk at work. <u>See</u> Echazabal, 536 U.S. at 78. Direct threat means "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r).

The First Circuit has noted a distinction between a defendant offering safety concerns in the context of a direct threat defense and offering them as a legitimate and nondiscriminatory reason for taking adverse employment actions. In <u>López-López</u>, as here, the employee argued that the district court should have resorted to the direct threat defense in resolving whether she posed a safety risk after she experienced a mental breakdown that included threats of suicide at work. 958 F.3d at 107. According to the First Circuit, "[t]he district court properly determined that the [employer] articulated a 'legitimate, nondiscriminatory reason,' which is generally distinct from a 'direct threat' defense. . . . The [employer] did not need to rely on a 'direct threat'

defense to prevail on summary judgment, and thus the district court did not need to address that defense." Id. at 108 (citing Curley v. City of North Las Vegas, 772 F.3d 629, 632 (9th Cir. 2014) and Bodenstab v. Cty. of Cook, 569 F.3d 651, 659 (7th Cir. 2009)). Other courts have similarly found that the existence of the direct threat defense does not prevent a defendant from offering concerns for a plaintiff's safety as a legitimate and nondiscriminatory reason for employment decisions. See, e.g., Sutherland v. Edison Chouest Offshore, Inc., No. CV 19-414, 2020 WL 5436654, at *11 (E.D. La. Sept. 10, 2020) ("In the alternative, the Court finds that even if the absence of a diagnosis of coronary artery disease created an issue of fact as to the applicability of the direct threat defense, defendants' documented concerns over plaintiff's ability to perform his job safely are a legitimate, nondiscriminatory reason for the allegedly adverse employment action.").

Here, it is not disputed that the defendants had concerns for Remillard's safety. Thus, the defendants are not confined to asserting their safety concerns in the context of the direct threat defense. Instead, as several courts recognize, they may offer their concerns for Remillard's safety at the second step of the McDonnell Douglas analysis as a legitimate and non-discriminatory reason for the adverse employment actions. See, e.g., Owen v. Union Pac. R.R. Co., No. 8:19CV462, 2020 WL 6684504, at *7 (D. Neb. Nov. 12, 2020) ("[Plaintiff's] claim fails because [Defendant] stated a legitimate, nondiscriminatory reason for removing [him] from service—his safety—and [Plaintiff] does not adduce any probative evidence of pretext."); Sutherland, 2020 WL 5436654, at *11 ("[D]efendants' documented concerns over plaintiff's ability to perform his job safely are a legitimate, nondiscriminatory reason for the allegedly adverse employment action."); Rabuffo v. VCA, Inc., 222 F. Supp. 3d 406, 416 (E.D. Pa. 2016) ("[Defendant] articulated a legitimate, nondiscriminatory reason for refusing to permit Rabuffo to return to

work—namely, its concerns about her latex allergy and heart condition."); see also Sensing, 575 F.3d at 162 (explaining that, under the Massachusetts analogue to the ADA, "the affidavits from [plaintiff's] coworkers, questioning [plaintiff's] ability to perform her job safely [due to her multiple sclerosis flare-ups], provide evidence supporting [defendant's] purported legitimate, nondiscriminatory reason").

The record evidence is undisputed that the defendants had concerns for Remillard's safety after she had several allergic reactions at work. Those concerns are a legitimate, nondiscriminatory reason for her suspension and termination. The court therefore proceeds to the next step of the analysis to determine whether Remillard has pointed to any evidence of pretext.

iii.   <u>Evidence of Pretext and Discriminatory Animus</u>

At the third step of the <u>McDonnell Douglas</u> framework, a plaintiff "must proffer specific facts that would enable a reasonable factfinder to conclude that the employer's reason for [the adverse employment action] was a sham intended to cover up the employer's true motive." Forsythe v. Wayfair Inc., 27 F.4th 67, 80 (1st Cir. 2022) (quotation omitted). "[T]here is no mechanical formula for finding pretext . . . . The inquiry focuses on whether the employer truly believed its stated reason for taking action adverse to the employee." Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 116 (1st Cir. 2013). Of further relevance in this case, "[i]t is not enough for a plaintiff merely to impugn the veracity of the employer's justification; [s]he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real and unlawful motive of discrimination." Rios v. Centerra Grp. LLC, 106 F.4th 101, 113 (1st Cir. 2024) (quotations omitted).

19

Remillard addresses the issue of pretext only briefly.[3] Regarding her suspension, Remillard states that there is evidence of pretext because the "defendants ultimately let [her] return to work in October 2018 without providing any of the information that they claimed was 'necessary' and without which they could not permit her to work." Doc. no. 31 at 25. Remillard contends that because "critical information somehow magically became irrelevant," it is reasonable to infer that the defendants were not actually concerned with her safety when they suspended her. Id.

Remillard, however, misconstrues the record and the interactions between the defendants, Remillard, and their counsel from July through September 2018. After Remillard's third serious allergic reaction on July 16, 2018, Goudreau became concerned that Remillard's reactions were getting worse and that they could be life-threatening. Consequently, the defendants did not allow Remillard to return to work immediately. Instead, during a July 18, 2018 meeting, Basta told Remillard that the defendants needed her to provide certain information before she could return to work, including a letter from her provider outlining her prognosis, treatment, and any restrictions or accommodations she needed at work. They also requested that her provider answer two questions: "[w]hat is the specific ingredient in bleach that triggers these episodes?" and "is this condition life threatening?" Doc. no. 29-1 at 9.

For the next approximately two months, Remillard, through her counsel, refused to provide any of the information that the defendants requested, and instead repeatedly demanded immediate reinstatement. The defendants persisted, maintaining that they needed additional

---

[3]  Of the 32 pages in her memorandum in support of her objection and her surreply, Remillard devotes a single paragraph to the issue of pretext and only in the context of her retaliation claim.

information from Remillard's provider so that they could evaluate whether they could continue to accommodate her.

Remillard eventually provided a letter written by her doctor to the defendants, dated September 10, 2018, that described the accommodations that would purportedly address Remillard's allergy. Several of the defendants' employees then met to discuss the contents of that letter and the likelihood that the recommended accommodations would keep Remillard safe.

On September 26, 2018, the defendants' counsel wrote a letter to Remillard's counsel explaining that the defendants had reviewed the doctor's letter and were willing to let Remillard return. The letter laid out the defendants' concerns, including their inability to "guarantee [Remillard's] safety or that she will not at some point be exposed to an agent that may cause a reaction." Doc. no. 29-37 at 2.

Remillard responded via letter through counsel on September 27, 2018. The letter stated that "Ms. Remillard fully understands that [the defendants] cannot offer her a guarantee that she will not be exposed to a triggering chemical, nor does she expect it." Doc. no. 29-38 at 2. Remillard returned to work on October 2, 2018.

Viewing these undisputed facts in the light most favorable to Remillard, no reasonable factfinder could conclude that the defendants' stated reason for not permitting Remillard to return to work from mid-July until October 2, 2018—that they were concerned for her safety— was a "sham intended to cover up for unlawful discrimination." Forsythe, 27 F.4th at 80. The defendants did not allow Remillard to return to work for approximately two-and-a-half months while they continually sought, and Remillard's counsel refused to provide, information to help them evaluate whether they could keep Remillard safe in the workplace. They allowed Remillard to return to work only after: 1) they received recommended accommodations from Remillard's

provider; 2) the defendant's employees met and considered whether they could and how best to implement those accommodations; 3) the defendant's attorney explained to Remillard's attorney the accommodations they could offer and made sure she understood that they could not guarantee that she would never be exposed to a triggering fragrance or chemical; and 4) Remillard agreed to those conditions. Although Remillard's doctor provided only some, but not all, of the information that Basta requested at the July 18 meeting, that fact simply does not allow an inference that the defendants were actually unconcerned with Remillard's safety after her July 2018 allergic reaction, and instead kept her out of work until October 2018 because of discriminatory animus. See, e.g., Rabuffo, 222 F. Supp. at 416–17 (finding no evidence of pretext where "the undisputed facts of this case show that [the employer] was genuinely concerned about [plaintiff's] latex allergy and heart condition and that these concerns were the reason [the employer] refused to permit [plaintiff] to return to work").

Remillard has similarly failed to point to any evidence of pretext or discriminatory animus regarding the defendants' eventual decision to terminate her employment. Her only argument as to pretext regarding her firing is that the defendants would not permit her to retrieve her belongings and say goodbye to her colleagues, but they allow her to visit the defendants' properties "as a member of the general public" (presumably, as a patient seeking medical care). Doc. no. 31 at 25. Remillard offers no record evidence to support these assertions. More importantly, she does not make any legal argument as to how the fact that the defendants did not subsequently ban her from presumably accessing medical care at their locations is evidence of pretext regarding her employment.

Basta, Bailey, Fallon, and Goudreau all testified that Remillard's prior allergic reactions at work, and particularly her fourth reaction, caused them to conclude that Remillard was not

safe working at Foundation. Remillard can point to no evidence in the record that anyone involved in the decision to terminate her was motivated by any reason other than concern for her safety.

Two further points warrant clarification. First, Remillard mentions that her co-workers expressed concerns about the severity of her final reaction "and about liability for treating" her. Doc. no. 30-1, ¶ 39.; doc. no. 31, ¶ 39.; see doc. no. 47 at 6. Remillard cites an October 15, 2019 email from Bailey to Sarah McGhee, Southern's Director of Employment and Development, after Remillard's final allergic reaction, in which Bailey writes that Remillard's co-workers had concerns "about their possible liability, when providing [Remillard] with her meds, etc. as they don't have her history." Doc. no. 30-29 at 3. Bailey notes that Remillard's co-workers were particularly concerned with liability arising from treating her during her last reaction. Id. ("Given this was an emergency situation requiring immediate treatment, are they still potentially liable?"). Although Remillard mentions her co-workers' concerns in her briefing, she makes no argument as to their relevance. To the extent that she intended to argue that her co-workers' concerns are somehow evidence of pretext, that argument would have been unavailing. There is no evidence that any decision-maker considered Remillard's co-workers' concerns regarding potential personal liability. As discussed at length above, the only evidence in the record is that the defendants terminated Remillard's employment because of their concerns for her safety.

Second, it is worth addressing what is ultimately the crux of Remillard's theory of her discrimination claim based on her suspension and termination: that the defendants were motivated by discriminatory animus because their actions towards her "ignored all medical

evidence" and were based "only on their own irrational fears." Doc. no. 30-1 at 13.[4] Again, according to the First Circuit:

> [E]vidence that would provide a supportable basis for reaching a different conclusion than the employer did with respect to its stated basis for the employment action does not suffice for a plaintiff to defeat summary judgment on the ground that the employer's stated basis was pretextual. . . . Rather, when a plaintiff seeks to show pretext by debunking the stated reason for the adverse employment action, they must present evidence from which a reasonable jury could supportably conclude that the employer's explanation is not just wrong, but that it is so implausible that the employer more likely than not does not believe it.

Dusel v. Factory Mut. Ins. Co., 52 F.4th 495, 507–08 (1st Cir. 2022) (citations and quotations omitted). Remillard cannot prevail on this argument. Not only is the evidence insufficient to show that the defendants' stated fears were "so implausible" that they likely did not believe that Remillard was in danger, but any argument that the defendants' actions were based on "irrational fears" is inconsistent with the record. Remillard had to visit the emergency room four times during her employment at Foundation, and she was unable to breathe and needed an IV to open her airway during the fourth incident, which was her final and most serious reaction at work. There is a litany of evidence illustrating Remillard's coworkers' contemporaneous concerns for her safety. The defendants' stated justification—that they feared for Remillard's safety—is not at all "implausible." Dusel, 52 F.4th at 507-08.

For the foregoing reasons, Remillard has failed to point to evidence of pretext or discriminatory animus motivating the defendants' decisions to place her on leave and terminate her employment. Therefore, the court grants summary judgment to the defendants on that theory of discrimination.

---

[4] Remillard makes this argument only in relation to the availability of the direct threat defense. Because it could arguably be relevant in the context of pretext, the court addresses it here.

2.    Failure to Accommodate

As discussed above, Remillard contends in Count I that the defendants also discriminated against her by failing to accommodate her.

> In order to survive a motion for summary judgment on a reasonable accommodation claim, the plaintiff must produce enough evidence for a reasonable jury to find that (1) [s]he is disabled within the meaning of the ADA, (2) [s]he was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) [the defendant], despite knowing of [the plaintiff]'s disability, did not reasonably accommodate it.

Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 102 (1st Cir. 2007). Here, the parties dispute whether the defendants reasonably accommodated Remillard's disability.

"Under the third element, an employee's request for accommodation . . . creates a duty on the part of the employer to engage in an interactive process." E.E.O.C. v. Kohl's Dep't Stores, Inc., 774 F.3d 127, 132 (1st Cir. 2014). "The interactive process involves an informal dialogue between the employee and the employer in which the two parties discuss the issues affecting the employee and potential reasonable accommodations that might address those issues." Id. "It requires bilateral cooperation and communication." Id.

Remillard first sought accommodations for her allergy in January 2018 when, at the defendants' request, she met with the employee health department. She concedes that the defendants implemented several accommodations for her disability during her employment. See supra at n.1. In her objection to the defendants' summary judgment motion, however, Remillard asserts that the defendants failed to implement or fully implement certain reasonable accommodations that she requested, including posting signs that the facility was fragrance-free. At oral argument, Remillard clarified that she was arguing that the defendants also failed to

"educate and reeducate" employees on the accommodations, and that they did not grant her request for a brief leave of a day or two after a serious allergic reaction.

The defendants argue that they reasonably accommodated Remillard's disability and, to the extent that they did not, they are not liable because Remillard failed to engage in the interactive process. They also make an argument that implementing a fragrance-free policy in an oncology center would have been unreasonable. The court addresses this latter argument first.

a.      Fragrance-Free Workplace

The defendants rely on out-of-circuit authority to argue that "a fragrance-free workplace is objectively unreasonable." Doc. no. 29-1 at 18 (citing Montenez-Denman v. Slater, 208 F.3d 214 (6th Cir. 2000) (holding that it would be "impractical and virtually impossible" for the defendant-employer to enforce a fragrance-free work environment)); Kaufmann v. GMAC Mortg. Corp., No. CIV.A. 04-CV-5671, 2006 WL 1371185 (E.D. Pa. May 17, 2006) (citing Montenez-Denman but holding that the "no-fragrance policy" sought by the plaintiff in that case was unreasonable because it applied to "all visitors" and requested "disciplinary measures" against non-complying employees), aff'd sub nom. Kaufmann v. GMAC Mortg., 229 F. App'x 164 (3d Cir. 2007). The court recognizes that the cases that the defendants cite in their motion generally support their position. But "[c]laims for failure to provide a reasonable accommodation require 'difficult, fact intensive, case-by-case analyses, ill-served by per se rules or stereotypes.'" Coad v. Buckman Lab'ys, Inc., No. 1:14-CV-254-NT, 2016 WL 1089229, at *11 (D. Me. Mar. 18, 2016) (quoting García-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 650 (1st Cir. 2000)).

Here, there is evidence in the record that Goudreau was aware of another oncology center that had implemented a fragrance-free policy. See doc. no. 29-11 at 19. Further, Remillard's

conception of a fragrance-free workplace is distinguishable from the cases that the defendants cite where, seemingly, the plaintiff was demanding the complete elimination of fragrances from the workplace. Specifically, Remillard's position at oral argument was that she did not expect the actual elimination of all scents from the practice, and she particularly did not expect the practice to turn away patients. On this record, the court cannot decide as a matter of law whether Remillard's request for a fragrance-free workplace and signs denoting it as such was unreasonable. The court therefore proceeds with the defendants' other arguments.

b.     <u>Interactive Process and the Defendants' Accommodations</u>

The court has discussed at length the process through which Remillard requested and the defendants implemented certain accommodations. However, it is worth briefly summarizing the relevant record evidence.

The defendants and Remillard began the interactive process during a meeting in January 2018. After that meeting, the defendants implemented several accommodations that they believed were necessary and reasonable based on the information Remillard provided. The defendants did not implement Remillard's request to put up signs stating that the oncology center was a fragrance-free environment.

When Remillard suffered harmful exposures to chemicals and fragrances during her employment, the defendants sought additional information from her through the interactive process in order to evaluate the adequacy of her accommodations. Specifically, after her third reaction, the defendants provided Remillard with a "Referral for Medical Evaluation and Information" and directed Remillard to acquire "a letter on office letterhead outlining [her provider's] diagnosis, prognosis, treatment, follow-up plans and any specific recommendations

(if any)[,] restrictions[,] or accommodations at work." Doc. no. 30-22. The defendants further asked "[w]hat is the specific ingredient in bleach that triggers these episodes?" and "is this condition life threatening?" Id. Remillard eventually provided a letter written by her doctor to the defendants that described the accommodations that would purportedly address Remillard's allergy, but she did not provide an answer to the two specific questions the defendants posed or every piece of information that the defendants requested. At that time, Remillard's attorney also suggested that a day or two of paid leave after a significant reaction would be a reasonable accommodation. The defendants believed that they had already been providing, and could continue to provide, those accommodations. They allowed Remillard to return to work after her attorney represented that she agreed and understood that the defendants could not guarantee her safety.

Remillard worked without a major incident for a year before she suffered her most serious allergic reaction. After this reaction, the defendants kept Remillard out of work while they considered whether they could keep her safe. Remillard sought to come back to work, stating in an email that the accommodations that the defendants had put in place were working and suggesting that "some refresher education may be in order for other employees." Doc. no. 29-48 at 2. The defendants eventually concluded they could not continue to employ Remillard because of their safety concerns. McGhee met with Remillard on October 31, 2019, and informed her that the defendants were terminating her employment. During that meeting, Remillard "asked why reeducation wasn't an option." Doc. no. 30-32. McGhee "quickly turned [the] conversation" to the defendants' safety concerns. Id.

Viewing the record evidence in the light most favorable to Remillard, there are disputes of fact as to whether the defendants failed to reasonably accommodate her with respect to three

potential accommodations. As discussed above, the defendants did not post signs in their facility denoting it as a fragrance-free environment, which Remillard requested at the outset of her employment. It is unclear from the record whether they gave her a day or two of paid leave while they were considering her employment future, as her attorney requested after her third serious reaction. And they do not address in their briefing Remillard's last request for reeducating employees.[5]

The defendants argue that they cannot be held liable for any alleged failure to accommodate Remillard's disability because she did not engage in the interactive process. It is true that Remillard did not provide all of the information that the defendants requested. And, although Remillard continues to maintain that those requests were inappropriate under the ADA, they appear "to be job-related and consistent with business necessity" such that they are permitted under the statute. 42 U.S.C. § 12112(d)(4)(A); see also Enforcement Guidance: Disability-related Inquiries and Medical Examinations of Employees Under the Americans With Disabilities Act, 2000 WL 33407181, at *9. But Remillard did propose accommodations after her third reaction, including suggestions by her doctor and her attorney, and the defendants evaluated and implemented, or continued to implement, those accommodations. Although Remillard and her doctor did not provide every piece of information that the defendants sought, the defendants do not explain how that affected their decision or the accommodations they implemented. Cf. Kohl's, 774 F.3d at 133-34 (affirming summary judgment in favor of the defendants on failure to accommodate claim because the employee did not "engage in a good-

---

[5] It is worth noting that Remillard contends that the defendants had decided to fire her before she made the request for reeducating employees, doc. no. 30-1, ¶ 45, which may have obviated the defendants' need to consider it as an accommodation request. See Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 90 (1st Cir. 2012). However, the defendants deny that they had decided to fire Remillard before she first made the request. Doc. no. 32-1 at 16.

faith effort to work out potential" reasonable accommodations). On this record, the court cannot find as a matter of law that Remillard failed to engage in the interactive process.

The defendants raise several persuasive arguments to suggest that they did reasonably accommodate Remillard. They implemented numerous accommodations at the beginning of Remillard's employment, including requesting "staff to avoid wearing any scent/perfumes," "[l]ocat[ing] patients who arrive wearing strong scents as far away from [Remillard] as possible (which sometimes involved reassigning patients to other staff nurses unexpectedly)," and speaking to patients who arrived wearing strong scents to ask "if they could refrain from using scented products on their next visit." Doc. no. 29-32 at 2. Although they did not post signs denoting that their facility was a fragrance-free environment, Remillard did not request that accommodation again before she came back from suspension and there is support that such a request would not have been reasonable given the facts of the case. They engaged with Remillard and her attorney after a serious incident, despite seemingly unnecessary resistance from Remillard, in an effort to ensure Remillard's safety at work. Even Remillard stated her belief, including just before the defendants terminated her employment, that the accommodations that the defendants had implemented were working.

Those arguments weigh strongly in the defendants' favor on Remillard's failure to accommodate claim. And they may well persuade a jury to side with the defendants. But at the summary judgment stage, where the court must view the evidence in the light most favorable to Remillard, there is a dispute of fact as to whether the defendants failed to reasonably accommodate Remillard's disability. Therefore, the court denies the defendants' motion as to that portion of Count I.

B.    Retaliation

As with Remillard's claim for disability discrimination based on her suspension and termination, the court analyzes Remillard's retaliation claim under the McDonnell Douglas framework. D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 41 (1st Cir. 2012). Remillard must make out a *prima facie* case of retaliation by showing "that (1) . . . she engaged in protected conduct, (2) . . . she was subjected to an adverse action by the defendant, and (3) there was a causal connection between the protected conduct and the adverse action." Id. If she establishes her *prima facie* case, the burden then shifts to the defendants to articulate a legitimate, non-retaliatory explanation for the adverse action. Id. If the defendants do so, "the burden shifts back to [Remillard] to show that the proffered legitimate explanation is pretextual, meaning that the defendant was motivated by a retaliatory animus." Id.

In her objection to the defendants' motion, Remillard lists five allegedly adverse actions that could support her retaliation claim, including the defendants' alleged refusal to engage fully in the interactive process. Doc. no. 31 at 24-25. At oral argument, Remillard narrowed the bases of her retaliation claim and asserted that she suffered an adverse employment action only when the defendants placed her on suspension and fired her. She asserts that she engaged in protected conduct by requesting accommodations for her disability and by refusing to respond to what she determined were impermissible medical inquiries by the defendants.[6]

For substantially the same reasons that the court discussed above regarding Remillard's claim stemming from her termination and suspension, the defendants are entitled to summary judgment on Remillard's retaliation claim. Assuming without deciding that Remillard could

---

[6] Remillard's arguments regarding her retaliation claim come largely from oral argument. She addresses her retaliation claim in her briefing in only cursory fashion. Doc. no. 31 at 24-25.

make out a *prima facie* case of retaliation,[7] the defendants have carried their burden to show that they had a legitimate, nonretaliatory reason for taking adverse employment actions—their concern for Remillard's safety. Thus, the burden shifts to Remillard to point to evidence of pretext.

She has not done so. Again, Remillard points to two supposed pieces of evidence of pretext in her summary judgment briefing: the defendants 1) allowed her to return to work in October 2018 despite not receiving all of the information regarding her allergy that they requested and 2) allowed her to visit their properties as a member of the general public after they terminated her employment. As the court held, that evidence would not "enable a reasonable factfinder to conclude that the employer's reason for termination was a 'sham' intended to cover up the employer's true motive." Forsythe, 27 F.4th at 80. Rather, the evidence in the record shows only that the defendants suspended Remillard and terminated her employment because they were concerned for her safety.

At the hearing, Remillard offered a different theory with regard to her suspension. She argued that she continued to request accommodations and engage in the interactive process from January 2018 through July 18, 2018, when she was told that she could not return to work until she responded to the defendants' inquiries about her allergy. She contends that because she requested accommodations consistently from the beginning of her employment until her suspension, a reasonable jury could infer that the defendants suspended her in retaliation for making those requests. Even if Remillard's theory were correct, the evidence that Remillard

---

[7] The defendants persuasively argue that Remillard points to no evidence of a causal connection between her requests for accommodations and any adverse action. Nevertheless, because Remillard fails to point to any evidence of pretext as discussed below, the court assumes for the purpose of this analysis that Remillard has met her minimal burden to show a *prima facie* case of retaliation.

cited at the hearing does not show that she continually requested accommodations or engaged in the interactive process over that six-month period. Rather, all of the evidence Remillard cited refers to events in January 2018, when she initially requested and the defendants largely implemented accommodations.[8] And, although Remillard does not argue that she can establish causation based on temporal proximity, the court observes that a six-month period between protected activity and an adverse employment action is "insufficient to establish a causal connection based on temporal proximity." Calero-Cerezo v. U.S. Dep't of Just., 355 F.3d 6, 25 (1st Cir. 2004) (noting that "[t]hree and four month periods" between an employer's knowledge of protected activity and an adverse employment action "have been held insufficient to establish a causal connection based on temporal proximity").

In sum, Remillard fails to point to any evidence that could allow a reasonable factfinder to conclude that the defendants' stated reason for suspending and terminating her—concerns for her safety—were pretext for retaliating against her for requesting accommodations. Therefore, the court grants the defendants' motion for summary judgment as to Count II.

II.    Remillard's Summary Judgment Motion

Remillard moves for summary judgment on Count I. For the reasons discussed above, the court grants the defendants' summary judgment motion as to the portion of Count I based on Remillard's suspension and termination. The court therefore confines its analysis of Remillard's motion to her failure to accommodate claim.

---

[8] Remillard cited her statement of material facts at paragraphs 10, 11, 14, and 15, doc. no. 30-1 at 4-5, as well as plaintiff's exhibit 5, doc. no. 30-7 at 2.

Remillard argues that she is entitled to summary judgment because the undisputed evidence shows that the defendants cannot satisfy the ADA's direct threat affirmative defense. According to Remillard, absent the defendants' ability to assert that defense, she is entitled to summary judgment because there is no dispute that the defendants failed to accommodate her. She is wrong on both arguments.

As mentioned above, a direct threat means "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r).

> The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:
>
> (1) The duration of the risk;
> (2) The nature and severity of the potential harm;
> (3) The likelihood that the potential harm will occur; and
> (4) The imminence of the potential harm.

Id.

Remillard argues that the defendants did not conduct an "individualized assessment" of her ability to safely perform the essential functions of her job. In support, she contends that the defendants overstate the nature and severity of the potential harm because she recovered from her allergic reactions and was cleared to return to work. She further argues that the likelihood and imminence of the potential harm are only at issue because the defendants did not "fully implement" all reasonable accommodations.[9] Doc. no. 30-1 at 16.

---

[9] Remillard suggests that the defendants' assessment was also insufficient because they did "not rely on any medical expertise" or review her medical records. Doc. no. 30-1 at 15, 17.

"[W]hether an individual is a direct threat under Title I is a complicated, fact intensive determination, not a question of law, and . . . the determination should be made after weighing all of the evidence about the nature of the risk and the potential harm." Hernandez v. W. Texas Treasures Est. Sales, LLC, 79 F.4th 464, 470 (5th Cir. 2023) (quotation omitted). Thus, the "question is whether there is any evidence in the record that creates a genuine issue of material fact as to whether [the defendants] meaningfully assessed [plaintiff's] ability to perform [her] job safely and reasonably concluded that [s]he posed a direct threat." Nall v. BNSF Ry. Co., 917 F.3d 335, 344 (5th Cir. 2019).

Here, viewing the evidence in the light most favorable to the defendants, there is a dispute of material fact as to whether the defendants can take shelter behind the direct threat defense. Although Remillard disagrees with the defendants' assessment of her risk of harm and the likelihood that she would suffer another allergic reaction, those are quintessential factual disputes, and the court cannot resolve them in Remillard's favor on her motion for summary judgment.

The court notes that even if it determined at this stage that the defendants could not prove their direct threat affirmative defense, that conclusion would not entitle Remillard to summary judgment on her failure to accommodate claim. As discussed above, the defendants implemented a litany of accommodations during Remillard's employment. Viewing the evidence in the light most favorable to the defendants, there is, at a minimum, a dispute of material fact as to whether

---

Although the defendants dispute that assertion, even if that were true, case law "has recognized that testimonial evidence can provide sufficient support for a direct threat finding under the ADA" in certain circumstances. Darnell v. Thermafiber, Inc., 417 F.3d 657, 660 (7th Cir. 2005) (citing cases); Michael v. Troy Police Dep't, 808 F.3d 304, 307 (6th Cir. 2015).

they reasonably accommodated Remillard. Therefore, the court denies Remillard's summary judgment motion.

<u>Conclusion</u>

For the foregoing reasons, the plaintiff's motion for partial summary judgment (doc. no. 30) is denied. The defendants' motion for summary judgment (doc. no. 29) is granted as to the plaintiff's retaliation claim in Count II and her discrimination claim in Count I to the extent that it is based on adverse employment actions. The defendants' motion is denied as to the plaintiff's discrimination claim in Count I to the extent that it is based on a theory of failure to accommodate.

SO ORDERED.

Samantha D. Elliott
United States District Judge

September 30, 2024

cc: Counsel of Record.